**In re AI REALTY MARKETING OF NEW YORK, INC., Laser Acquisition Corp., DDG I, Inc., Sunbeam Americas Holdings, Ltd., et al., Debtors.**

**Sunbeam Products, Inc., Plaintiff– Counterclaim Defendant,**

**v.**

**Wing Shing Products (BVI) Ltd., Defendant–Counterclaimant.**

Bankruptcy No. 01–40252 (AJG).
Adversary No. 01–2439(AJG).

United States Bankruptcy Court,
S.D. New York.

June 3, 2003.

Weil, Gotshal & Mangès, LLP, Kevin P. Hughes, Nicholas Groombridge, Brian S. Sung, of counsel, New York City, for Sunbeam Products, Inc.

Perkins & Dunnegan, William Dunnegan, Ronald L. Zaslow, of counsel, New York City, for Wing Shing Products (BVI) Ltd.

## MEMORANDUM DECISION, AFTER TRIAL, REGARDING THE OWNERSHIP AND INFRINGEMENT OF U.S. PATENT NO. D348,585

ARTHUR J. GONZALEZ, Bankruptcy Judge.

### I. INTRODUCTION

Plaintiff–Counterclaim Defendant, Sunbeam Products, Inc. ("Sunbeam"), a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Palm Beach County, Florida, is a subsidiary of Sunbeam Corporation. Sunbeam acquired Signature Brands, Inc. ("Signature Brands") in 1998, which had previously acquired Mr. Coffee, Inc. ("Mr. Coffee") in 1996.[1] Defendant–Counterclaimant, Wing Shing Products (BVI) Ltd. ("Wing Shing"), a corporation organized and existing under the laws of the British Virgin Islands with a place of business in Hong Kong, is a subsidiary of Global–Tech Appliances Inc. ("Global–Tech"), a publicly traded company listed on the New York Stock Exchange. Wing Shing is one of a family of companies under common ownership and management.[2] Wing Shing is a manufacturer of coffeemakers and other consumer products. Since 1992, Wing Shing has supplied model number AD10 coffeemakers (the "AD10"), a 10–cup coffeemaker, and derivatives and variations of the AD10 (together with the AD10, each an "AD Coffeemaker" and collectively, the "AD Coffeemakers") to Sunbeam. Since at least 1994, Sunbeam has also sourced AD Coffeemakers from Simatelex Manufactory Co., Ltd. ("Simatelex"), another manufacturer of consumer products. Wing Shing is the holder of the design patent for the AD Coffeemaker specifications, U.S. Patent No. D348,585 (the "Design Patent").

On February 23, 2001, Sunbeam commenced this adversary proceeding (the "Adversary Proceeding") against Wing Shing, requesting this Court to enter a judgment declaring that Sunbeam: (i) is the exclusive owner of the Design Patent; (ii) has an indefinite exclusive license to market and sell the AD Coffeemakers in the United States, Canada and Mexico; and (iii) has the full right and authority to choose the supplier of its choice for the manufacture of the AD Coffeemakers. On March 13, 2001, Wing Shing filed a counterclaim against Sunbeam requesting this Court to enter a judgment, as later amended: (i) permanently enjoining Sunbeam, its officers, directors, employees and attorneys and all those acting in concert with them from infringing the Design Patent; (ii) awarding Wing Shing its damages and/or the total profits from the infringement of the Design Patent; (iii) awarding Wing Shing treble damages; and (iv) awarding Wing Shing its costs relating to the action brought before this Court including its reasonable attorneys' fees.

Sunbeam contends that it was assigned the Design Patent by Wing Shing pursu-

---

1. For purposes of this Memorandum Decision, Sunbeam, Signature Brands and Mr. Coffee are sometimes referred to collectively as "Sunbeam."

2. For purposes of this Memorandum Decision, all Wing Shing-related entities, including Wing Shing Products (BVI), Limited, Wing Shing Overseas, Ltd. and Pentalpha Enterprises, Inc. ("Pentalpha"), are sometimes referred to collectively as "Wing Shing."

ant to an agreement between Mr. Coffee and Wing Shing Overseas Ltd., entered into as of June 22, 1992 (the "Agreement"), and that it also holds an indefinite exclusive license to the Design Patent pursuant to the Agreement. Furthermore, Sunbeam asserts that, as a result of the contributions that Mr. Coffee made to the development of the Design Patent, this Court should find that it is a joint inventor of, and is therefore entitled to exploit, the Design Patent. In response, Wing Shing claims that Sunbeam has not been assigned any rights to the Design Patent pursuant to the Agreement, nor was Sunbeam granted a license to the Design Patent extending beyond December 31, 1994, the termination date of the Agreement. Wing Shing also claims that John Sham ("Sham"), president of Wing Shing Global–Tech, is the sole inventor of the Design Patent.

The following decision is the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as incorporated into this Adversary Proceeding under Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## II. JURISDICTION

This Adversary Proceeding relates to the Chapter 11 cases, styled *In re AI Realty Marketing of New York, Inc., Laser Acquisition Corp., DDG I, Inc., Sunbeam Americas Holdings Ltd., et al.*, Chapter 11 Case Nos. 01–40252(AJG) through 01–40290(AJG). The Court has jurisdiction over this Adversary Proceeding pursuant to section 1334(b) of title 28 of the United States Code. This Adversary Proceeding is a core proceeding pursuant to section 157(b) of title 28 of the United States Code. Venue is proper in the district of New York pursuant to section 1408 of title 28 of the United States Code.

## III. FACTUAL AND PROCEDURAL BACKGROUND

In June 1991, Sham approached Mr. Coffee to inquire into a potential business relationship between the two entities. Sham informed Mr. Coffee that Wing Shing had coffeemakers of a specific design that it was interested in manufacturing and selling to Mr. Coffee. Sham provided Jeffrey Blackwell ("Blackwell"), then Vice President of Operations of Mr. Coffee, with sketches of the proposed coffeemakers. On July 23, 1992, Sham informed Dilworth & Barrese, LLP, patent counsel to Wing Shing, that Wing Shing wanted to proceed with the Design Patent, which represented the design of the coffeemakers that Sham had previously forwarded to Blackwell. In August 1991, Blackwell responded to Sham with a number of questions concerning the proposed coffeemaker's design and requesting a price quote. Sham followed-up with a photograph of a wooden model depicting the proposed coffeemaker. Beginning with Blackwell's August 1991 letter through early 1992, there were multiple correspondences between Mr. Coffee and Wing Shing regarding the proposed coffeemaker. Through these correspondences Mr. Coffee suggested a number of changes to the coffeemaker to Wing Shing. These included the following:

- *Eliminating the grooves on the brew basket.* The proposed coffeemaker originally had grooves on its brew basket.

- *Eliminating the ridges on the reservoir cover.* The proposed coffeemaker originally had ridges on its reservoir cover.

- *Moving the power switch to the column.* The proposed coffeemaker originally had the power switch on its base.

- *Opening the brew basket from left to right.* The proposed coffeemaker originally opened from right to left.
- *Moving the water-level gauge from the right to left side of the coffeemaker.* The proposed coffeemaker originally positioned the water-level gauge on the right side.
- *Inserting a bottom metal plate.* Mr. Coffee provided Wing Shing with a sample metal plate, modeled after the plate located on the bottom of the Mr. Coffee IDS40 coffeemaker, to be inserted on the bottom of the coffeemaker.
- *Adding a shroud to the power switch.* The proposed coffeemaker did not have a shroud.

On November 8, 1991, Mr. Coffee provided Wing Shing with a draft supply agreement. Mr. Coffee and Wing Shing proceeded to negotiate the terms of this supply agreement, and entered into the Agreement as of June 22, 1992. Sham executed the Agreement on July 1, 1992, and Mark Kopaskie ("Kopaskie"), who succeeded Blackwell as Vice President of Operations at Mr. Coffee, executed the Agreement on July 13, 1992. Terms of particular import are as follows:

- Paragraph 4(a) of the Agreement states that "this Agreement shall begin on January 7, 1992 and shall extend through December 31, 1994." The Agreement also provides that it may be terminated by Mr. Coffee prior to the end of its term upon at least ninety (90) days prior written notice.
- Paragraph 16(a) of the Agreement states that "[a]ny and all existing patent rights for the units or any of its component parts shall be the sole and exclusive property and/or responsibility of Mr. Coffee. In the event that Mr. Coffee and [Wing Shing] jointly develop a patentable item both parties agree to negotiate patent rights prior to applying for the patent."
- Paragraph 17 of the Agreement provides that Mr. Coffee shall have an "exclusive license" to market and sell the [AD Coffeemaker] in accordance with the terms of the Agreement in the United States, Canada and Mexico.
- Paragraph 9 of the Agreement provides that the "tooling, and drawings related thereto, is the property of Mr. Coffee, inc. [sic]."

Subsequent to the execution of the Agreement, Wing Shing began to manufacture and sell AD Coffeemakers to Mr. Coffee pursuant to the terms of the Agreement. Mr. Coffee paid $100,000 to Wing Shing for the tooling necessary to manufacture the AD10.

On July 13, 1992, Sham filed an application for a design patent on the AD Coffeemaker without informing Mr. Coffee that he was doing so. Sham listed himself as the AD Coffeemaker's sole inventor on the patent application. Sham was issued the Design Patent by the United States Patent and Trademark Office on July 12, 1994. Sham did not inform Mr. Coffee of the issuance of the Design Patent. At no time thereafter did Wing Shing include notice of the Design Patent on the AD Coffeemakers or their packaging.

In a communication to Wing Shing dated November 28, 1994, Mr. Coffee told Wing Shing that Simatelex was also manufacturing AD Coffeemakers for Mr. Coffee. Wing Shing did not object to the manufacture and sale of the AD Coffeemakers by Simatelex at that time. On March 9, 1995, in a facsimile (the "March 9, 1995 Fax") to Dan Kubis ("Kubis"), then an employee of Mr. Coffee, and in response to Mr. Cof-

fee's request to transfer certain tooling to another manufacturer, Wing Shing wrote, "[a]s regarding to the tooling that you requested to have it to be transferred to other manufacturer, it's a bad news to us. However, you own this tooling and we will have no objection if you decided to do so ... the important point is that we have the product design patent of AD10 and was being filed. That means, we can sell and we will sell the same product to other customers in the same market. It will definitely create business conflicts between us." Wing Shing refrained from informing Mr. Coffee that it (Mr. Coffee) was infringing the Design Patent and from requesting that Mr. Coffee cease and desist such activity.

On or about January 18, 1996, Sham attended an international houseware show (the "Chicago Houseware Show") in Chicago, Illinois. During the Chicago Houseware Show, Sham observed at Mr. Coffee's booth an AD Coffeemaker that Wing Shing had not manufactured. Sham allegedly discussed this non-Wing Shing AD Coffeemaker with Kubis at the Chicago Houseware Show. On January 18, 1996, Kubis sent a letter to Wing Shing complaining that several Mr. Coffee customers had noticed that Pillsbury was selling the AD Coffeemaker under its name. Kubis also indicated in that letter that a major customer was interested in shifting its business with Mr. Coffee from the AD10 to an AD12 coffeemaker (the "AD12"). Kubis said that Mr. Coffee would like to "reward" Wing Shing by having it manufacture the necessary AD12 should the AD10 business decrease. Wing Shing responded by facsimile, dated February 1, 1996, stating that it would provide a quote for the AD12. Wing Shing also stated that it would cease producing the AD Coffeemaker for Pillsbury upon Mr. Coffee's request. On June 10, 1996, Sham assigned

the Design Patent to Wing Shing for the sum of US$25,000.

In the fall of 1998, Sunbeam, which had acquired the Mr. Coffee product line, considered shifting the production of AD Coffeemakers away from Wing Shing to Simatelex. In an email correspondence to Bob Hunt, an employee of Sunbeam, dated November 1, 1998, David Buck, another Sunbeam employee, concluded that, "Pentalpha [Wing Shing] owns the tooling and design [of the AD Coffeemaker], even though 4 or 5 years ago we made the decision to tool the same design at Simatelex. They either don't realize this fact at Pentalpha [Wing Shing] or have kept quiet about it because our business was increasing with them. It likely WILL be an issue if we part ways with them, however." This email exchange formed the basis for an email from Paul Warfel ("Warfel"), an employee of Sunbeam, dated November 27, 1998, to Dana Blanch, another Sunbeam employee, that stated, "[t]he design [of the AD Coffeemakers] may change slightly to avoid any patent issues." Warfel also wrote in an internal Sunbeam memorandum, dated November 3, 1998, that Wing Shing owned the tooling and design of the AD Coffeemaker. In 1998, Sunbeam conducted a patent search relating to the Design Patent in connection with Sunbeam's reduction in product sourcing from Wing Shing. Sunbeam searched for design patents owned by Pentalpha and found nothing since the Design Patent was never assigned to that entity. Outside counsel was not employed by Sunbeam to assist with this patent search. Sunbeam has been unable to provide corroborating evidence that the search was conducted.

From 1999 to 2000, Sunbeam's volume of purchases from Wing Shing decreased by approximately 50%. On February 9, 2001, Wing Shing asserted a claim for patent

infringement by filing a complaint in the United States District Court for the Southern District of New York against Simatelex (the "District Court Action"). Wing Shing also submitted an application for an order of attachment. On February 15, 2001, Wing Shing filed a motion for relief from the automatic stay in the Sunbeam bankruptcy proceeding. On February 23, 2001, Sunbeam sought enforcement of the automatic stay and commenced this Adversary Proceeding against Wing Shing. On February 26, 2001, this Court denied Wing Shing's motion for relief from the automatic stay and enjoined Wing Shing from pursuing the District Court Action. On March 9, 2001, Wing Shing filed an answer and counterclaim in this Court.

## IV. DISCUSSION

### A. Sunbeam's Equitable Estoppel and Laches Defenses

■■■ Sunbeam has argued that Wing Shing is barred by the doctrine of equitable estoppel from collecting damages based on its claims of patent infringement. Sunbeam also claims that the doctrine of laches bars any recovery for acts of infringement prior to the commencement of this litigation. The defenses of equitable estoppel and laches are committed to the sound discretion of the court. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1028 (Fed.Cir.1992) ("As equitable defenses, laches and equitable estoppel are matters committed to the sound discretion of the trial judge."). *See also Ducon Envtl. Sys. Inc. v. Delta Conveying, Inc.,* No. 98–CV–0466, 2000 WL 270976, at *4, 2000 U.S. Dist. LEXIS 2894, at *13 (E.D.N.Y. March 8, 2000). Preponderance of the evidence is the appropriate evidentiary standard to be applied in connection with the proof of equitable estoppel and laches factors. *Aukerman,* 960 F.2d at 1045–1046. Using this standard of review, the Court holds that Wing Shing's claims are not barred by the doctrine of equitable estoppel, although Wing Shing is barred from recovery for acts of infringement prior to the commencement of the District Court Action by the doctrine of laches.

### 1. Sunbeam's Defense of Equitable Estoppel

■■■ The doctrine of equitable estoppel is a complete defense to a charge of patent infringement. *See Aukerman,* 960 F.2d at 1041. *See also Fuji Mach. Mfg. Co., Ltd. v. Hover–Davis, Inc.,* 60 F.Supp.2d 111, 115 (W.D.N.Y.1999). The elements of this defense are:

1) The patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer. "Conduct" may include specific statements, action, inaction or silence where there was an obligation to speak;

2) The alleged infringer relies on that conduct; and

3) Due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

*Aukerman,* 960 F.2d at 1028. *See also Essilor Int'l v. Nidek Co., Ltd.,* No. 95–CV–1243, 1998 U.S. Dist. LEXIS 22960, at *64 (E.D.N.Y. July 27, 1998).

■■■ Sunbeam argues that Wing Shing's claim of patent infringement is barred by the doctrine of equitable estoppel. However, the Court does not agree with Sunbeam's conclusion that, in satisfaction of the first element necessary to prove the defense of equitable estoppel, Wing Shing engaged in "misleading conduct" that led Sunbeam to infer that Wing Shing would not enforce the Design Patent. In *Forest Labs., Inc. v. Abbott Labs.,* No. 96–CV–

159–A, 1999 WL 33299123, at \*7, 1999 U.S. Dist. LEXIS 23215, at \*21 (W.D.N.Y. June 23, 1999), the court determined that "[i]n order to prove misleading conduct, the alleged infringer must show that the patentee somehow communicated to the alleged infringer that it did not intend to press an infringement claim. The alleged infringer may satisfy this requirement by producing evidence of affirmative statements or conduct by the patentee from which it is reasonable to infer that the patentee was not going to pursue an infringement claim." *See also Aukerman*, 960 F.2d at 1042. The Court looks to the facts of the case at hand to determine whether Wing Shing's conduct was indeed misleading.

■ Sham alleges that he informed Kubis at the Chicago Houseware Show that Wing Shing held the Design Patent and that Sunbeam should not buy AD Coffeemakers from another manufacturer. (Tr. 12/11/01 p. 47:8–10). The Court notes that this conversation is uncorroborated and, given the length of time that passed between the alleged conversation and the inception of Wing Shing's cause of action, the Court is reluctant to give weight to this alleged conversation. However, in the March 9, 1995 Fax from Wing Shing to Kubis, Wing Shing informed Sunbeam that "the important point is that we have the product design patent of AD10 and was being filed. That means, we can sell and we will sell the same product to other customers in the same market." (Ex. 21). Wing Shing has conceded that it never claimed that the March 9, 1995 Fax provided actual notice of the infringement, (Defendant–Counterclaimant's Post–Trial Reply Memorandum at 17), although the fax does indicate that Sunbeam was aware of the existence of the Design Patent and of the possibility that Wing Shing might try to use the Design Patent as leverage in its dealings with Sunbeam.

The meaning that Sunbeam assigned to the March 9, 1995 Fax and to Wing Shing's ownership of the Design Patent may be ascertained through an email sent by Buck to Hunt dated October 1, 1998, and through subsequent Sunbeam internal correspondence. Buck wrote that "Pentalpha [Wing Shing] owns the tooling and the design [of the AD Coffeemakers], even though 4 or 5 years ago we made the decision to tool the same design at Simatelex ... It likely WILL be an issue if we part ways with them." (Ex. 30). In a subsequent email sent by Warfel to Blanch dated October 27, 1998, Warfel wrote, "[t]he design [of the AD Coffeemaker] may change slightly to avoid any patent issues." (Ex. 31). Despite the fact that Buck was incorrect in his determination that Wing Shing owned the tooling for the AD Coffeemaker, these email exchanges suggest that, at the very least, Sunbeam was aware of potential patent infringement issues regarding the AD Coffeemakers, and that Sunbeam had to consider these potential infringement issues when contemplating its strategy regarding the AD Coffeemakers. These emails also demonstrate that, rather than being led to believe that Wing Shing was not going to pursue an infringement claim, Sunbeam was in fact concerned that the Design Patent might potentially become an issue of contention should Sunbeam cease doing business with Wing Shing. Furthermore, the Warfel email confirms that Sunbeam had contemplated reworking the AD Coffeemaker design to avoid conflict with Wing Shing. These internal communications lead this Court to conclude that Sunbeam was not misled by Wing Shing's conduct, and that Sunbeam was aware of and had discussed internally the potential danger of a patent infringement action being brought by Wing Shing at some future date. Therefore, the Court holds that the first element of the doctrine of equitable estoppel has

not been satisfied, and this defense should not bar Wing Shing's claims of patent infringement.

### 2. Sunbeam's Defense of Laches

The doctrine of laches bars any recovery for alleged acts of infringement prior to the commencement of the District Court Action. *See Aukerman,* 960 F.2d at 1041. *See also In re Singer Co., N.V.,* No. 01 Civ. 0165, 2002 WL 999273, at *15, 2002 U.S. Dist. LEXIS 8609, at *44 (S.D.N.Y. May 14, 2002). The elements that underlie the defense of laches are:

1) The patentee's delay in bringing suit was unreasonable and inexcusable; and

2) The alleged infringer suffered material prejudice attributable to the delay.

*Aukerman,* 960 F.2d at 1028. *See also Fuji Mach. Mfg. Co., Ltd.,* 60 F.Supp.2d at 115.

A presumption of laches arises from a delay in filing suit exceeding a period of six years. *Aukerman,* 960 F.2d at 1035. Sunbeam argues that a presumption of laches is applicable in this case, since Wing Shing first learned that Simatelex was manufacturing AD Coffeemakers through a communication received from Sunbeam on November 28, 1994. (Ex. AH). In his testimony, Sham acknowledged that as of that date Wing Shing was aware that Simatelex was manufacturing AD Coffeemakers. (Tr. 12/11/01 p. 44:14–22). However, Wing Shing argues that the six-year period has not been met in this instance since, if Sunbeam held a license for the Design Patent through the termination of the Agreement on December 31, 1994, then the six-year period would not begin until May 1995 when Sunbeam first purchased AD Coffeemakers from Simatelex after the termination of the Agreement. Wing Shing also argues that Sunbeam did not engage in a continuous six-year period of infringement because there were blocks of time when Sunbeam did not purchase AD Coffeemakers from Simatelex. Regardless of whether a presumption of laches arises in this case or not, the Court may look to the underlying elements and the facts to determine whether a defense of laches has been established. *See Aukerman,* 960 F.2d at 1036 ("Laches remains an equitable judgment of the trial court in light of all the circumstances."). This Court holds that Sunbeam has demonstrated that the underlying elements of laches have clearly been met, thus establishing a defense of laches regardless of whether the presumption applies.

Concerning the first element of laches, the Court concludes that Wing Shing's delay in bringing suit was unreasonable and inexcusable. Aukerman reasons that "[t]he length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances." *Aukerman,* 960 F.2d at 1032. *See also Essilor,* 1998 U.S. Dist. LEXIS 22960, at *59. As previously discussed, Wing Shing knew that Simatelex was manufacturing AD Coffeemakers from November 28, 1994, but chose not to bring suit for patent infringement until February 9, 2001. When considering whether a patentee's delay was unreasonable and inexcusable, a court must also weigh any justification offered by the patentee for its delay. *Aukerman,* 960 F.2d at 1033. In justifying its delay in bringing suit, Wing Shing argues that it believed that Simatelex was only manufacturing a minimal quantity of AD Coffeemakers, and that therefore the patent infringement was limited in scope. (Tr. 12/11/01 p. 147:5–14). The extent of infringement has been recognized as an excuse for a delay in bringing suit. *Aukerman,* 960 F.2d at 1033.

However, this Court does not agree with Wing Shing's assertion that it chose not to initiate the current action because of the perceived limited scope of the infringement.

Wing Shing received numerous indications that Sunbeam was having a substantial quantity of AD Coffeemakers produced by non-Wing Shing manufacturers. Beyond Sunbeam's written correspondence to Wing Shing in November 1994, which stated that Simatelex was producing AD Coffeemakers for Sunbeam, Sham had also observed AD Coffeemakers that were not manufactured by Wing Shing at the Chicago Houseware Show. Furthermore, in the March 9, 1995 Fax, Wing Shing acknowledged that Mr. Coffee had requested to have the tooling for the AD Coffeemakers transferred to another manufacturer, ostensibly so that such manufacturer could produce AD Coffeemakers. Sunbeam's January 18, 1996 correspondence to Wing Shing also indicated that Mr. Coffee was having the AD12 coffeemaker produced in small quantity by another company at that time. These indications, taken in concert, should have suggested to Wing Shing that the AD Coffeemakers were being produced by other manufacturers in potentially large quantities. If Wing Shing had been concerned with the enforcement of the Design Patent, it should have made a concerted effort to investigate the extent of the potential infringement and then brought action to enjoin such infringement.

The Court finds, however, that Wing Shing had ample reason not to bring suit against Mr. Coffee or Sunbeam, as demonstrated by Sham's testimony. Sham admitted that he instructed Peter Yu ("Yu"), a Wing Shing employee, not to include any references to the potential infringement of the Design Patent, or to demand that Mr. Coffee cease and desist buying AD Coffeemakers from Simatelex, because Wing

Shing did not want to lose Mr. Coffee's valuable business. (Tr. 12/11/01 p. 145:22–147:14). Furthermore, Sham went on to state that he did not want Yu to stop the infringement because Wing Shing did not want to jeopardize its relationship with Mr. Coffee. Later in his testimony, Sham acknowledged that part of the reason that Wing Shing was finally motivated to bring the current action was because the volume of Sunbeam's purchases of Wing Shing products dropped by 50% between 1999 and 2000. (Tr. 12/11/01 p. 171:12–16). Accordingly, the Court concludes that it is highly unreasonable for Wing Shing to expect to benefit from its failure to bring suit in a timely manner while enjoying Sunbeam's business, despite the fact that it had ample reason to believe that the Design Patent was being infringed, and to now recover damages for patent infringement during the pre-suit period. Wing Shing's failure to take action to cease the infringement of the Design Patent was both unreasonable and inexcusable, and satisfies the first element of the defense of laches.

 With regard to the second element of the laches defense, prejudice or injury to adverse parties resulting from the plaintiff's delay may be either economic or evidentiary. *See Aukerman,* 960 F.2d at 1033. *See also Essilor,* 1998 U.S. Dist. LEXIS 22960, at *59. "Economic prejudice may arise when a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Aukerman,* 960 F.2d at 1033.

Regarding economic injury, *Aukerman* emphasizes that "a patentee may [not] intentionally lie silently in wait watching damages escalate, particularly where an infringer, if he had had notice, could have switched to a noninfringing product." *Id.* at 1033. However, as discussed in this

Court's analysis of Sunbeam's alleged defense of equitable estoppel above, although the March 9, 1995 Fax from Wing Shing to Mr. Coffee did not amount to notice of infringement for statutory purposes, the fax did alert Mr. Coffee to the fact that the Design Patent could become problematic for Mr. Coffee at some future date. Sunbeam's understanding of this is corroborated by the October 1, 1998 email from Buck to Hunt and the October 27, 1998 email from Warfel to Blanch. These emails suggest that Sunbeam was aware of the risks relating to the potential infringement of the Design Patent. Warfel's assertion that "the [AD10] design may change slightly to avoid any patent issues" (Ex. 31) indicates in particular that Sunbeam knew that the surest means of avoiding a potential infringement claim would be to design around the scope of the Design Patent. That Sunbeam chose not to design around the Design Patent despite its awareness of the potential for a future infringement claim by Wing Shing prevents this Court from finding that Sunbeam suffered economic damages as a result of Wing Shing's unreasonable delay in bringing an action for patent infringement. Sunbeam, through its actions, demonstrated that it was willing to bear the economic risk of a later infringement claim. However, this Court does hold that Sunbeam suffered evidentiary prejudice as a result of Wing Shing's delay.

"Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Aukerman*, 960 F.2d at 1033. *See also Essilor*, 1998 U.S. Dist. LEXIS 22960, at *59–60. Sunbeam established through the testimony of Steven Berreth ("Berreth"), Vice President of the Property Counsel and President of Licensing for Sunbeam, that, of the employees who worked at Mr. Coffee from 1991 through 1996, David Buck was the only one still employed by Sunbeam at the time of the trial. (Tr. 12/12/01 p. 217:3–8). Sunbeam also demonstrated that a majority of the engineering documents from 1991 and 1992, the period during which the design of the AD Coffeemaker was being developed, were lost following the Sunbeam acquisition of Signature Brands in 1998, along with the records of the negotiations that occurred between Mr. Coffee and Wing Shing relating to the Agreement. According to Berreth, following the acquisition of Signature Brands by Sunbeam, only 150 boxes of Mr. Coffee records were located, containing almost entirely accounting and marketing records. (12/12/01 p. 219:10–25). Furthermore, Kubis, whom Sham allegedly informed of the infringement of the Design Patent at the Chicago Houseware Show in January 1996, was unable to be located in connection with this trial. (Tr. 12/12/01 p. 243:11–17).

It is clear to this Court that, as a result of Wing Shing's unreasonable delay in bringing suit for the infringement of the Design Patent, Sunbeam has suffered significant material evidentiary prejudice. The dispersion of potential witnesses, the misplacement of relevant documents and the loss of institutional knowledge relating to Mr. Coffee and Wing Shing's early relationship has severely hindered Sunbeam's ability to effectively litigate the present case. Sunbeam should not suffer the burden of evidentiary prejudice caused by a delay rooted in Wing Shing's desire to reap the benefits of a profitable business association with Sunbeam. This Court therefore holds that Wing Shing cannot presently take what amounts to a second bite at the apple by preserving the oppor-

tunity to recover for a claim accrued during the same period that Wing Shing was enjoying the rewards of its dealings with Sunbeam. The doctrine of laches applies in this case and Wing Shing will not be entitled to damages incurred prior to the inception of the District Court Action.

### 3. Wing Shing Failed to Provide Adequate Notice of Infringement

■ Sunbeam also argues that, prior to bringing the District Court Action, Wing Shing failed to provide adequate notice of the infringement to Sunbeam, thereby precluding Wing Shing's pre-suit claims. The Court accepts this as an alternate theory to laches in preventing Wing Shing from recovering pre-suit claims. Compliance with the notice provisions set forth in 35 U.S.C. § 287(a) is necessary for recovery pursuant to 35 U.S.C. § 284 or § 289. See Nike, Inc. v. Wal–Mart Stores, Inc., 138 F.3d 1437, 1446 (Fed.Cir.1998) (concluding "that the marking requirement, § 287(a), applies to design patents whether remedy for infringement is sought under § 284 or § 289."). There are two methods of complying with the § 287(a) statutory requirement: (i) constructive notice achieved by marking the patented items with the patent number; or (ii) actual notice achieved by notifying the alleged infringer of the charge of infringement. 35 U.S.C. § 287(a).

■ Wing Shing acknowledges that at no time did it request that a marking, indicating the existence of the Design Patent, be placed on the AD Coffeemaker, its packaging, or on any written insert included therewith. (Tr. 12/11/01 p. 142:15–143:10). Therefore, Wing Shing must rely on actual notice of the infringement to obtain pre-suit recovery.

■ Wing Shing further acknowledges that the only written correspondence delivered to Sunbeam attesting to the fact that Wing Shing held the Design Patent, the March 9, 1995 Fax, intentionally omitted any reference to the fact. that Sunbeam was infringing the Design Patent. (Tr. 12/11/01 p. 145:22–146:3). In order for actual notice to be deemed given for purposes of § 287(a), a patent holder must provide notice to an alleged infringer of the infringement. See Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 187 (Fed.Cir.1994). Since Wing Shing deliberately refrained from informing Sunbeam of the infringement in the March 9, 1995 Fax, the Court finds that the fax does not constitute notice pursuant to § 287(a). Moreover, Wing Shing has conceded that it never claimed that the March 9, 1995 Fax provided actual notice of the infringement. (Defendant–Counterclaimant's Post–Trial Reply Memorandum at 17).

The only act of notice that Wing Shing is able to present is the alleged conversation between Sham and Kubis at the Chicago Houseware Show. However, once again, the Court is unwilling to accept an uncorroborated, self-serving conversation as the only evidence of actual notice of infringement. The Court finds that in choosing to wait for an extended period of time to bring an action for infringement so that it could maximize its own profits, Wing Shing forfeited the right to rely on the alleged conversation between Sham and Kubis. Had Wing Shing brought suit in a timely manner, Kubis might have been located. Since Wing Shing made a conscious choice not to bring suit in a timely fashion, it may not at present rely on an uncorroborated Sham/Kubis conversation as its sole source of actual notice. Having failed to provide constructive or actual notice to Sunbeam prior to the commence-

ment of the District Court Action,[3] Wing Shing is precluded from the recovery of pre-suit claims.

## B. Contractual Issues

■■■ Sunbeam argues that the Agreement grants it ownership of, or a permanent license for, the Design Patent. Paragraph 23(f) of the Agreement states that the Agreement shall be governed by the laws of the State of Ohio. Under Ohio law, "contract terms are to be given their ordinary meaning. When the terms of the contract are clear on their face, the court has no need to construe the evidence otherwise." *Ohio Historical Soc'y v. General Maint. and Eng'g Co.*, 65 Ohio App.3d 139, 146, 583 N.E.2d 340 (Ohio Ct.App.1989). "When the terms included in an existing contract are clear and unambiguous, we cannot create a new contract by finding an intent not expressed in the clear and unambiguous language of the written contract." *Hamilton Ins. Servs. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 714 N.E.2d 898 (Ohio Sup.Ct.1999). The Agreement is clear and unambiguous on its face and there is no issue of fact to be determined regarding its interpretation. This Court finds that the Agreement does not provide for an assignment of the Design Patent to Sunbeam, nor does it grant Sunbeam a permanent license for the Design Patent.

### 1. Assignment of Existing Patent Rights

Sunbeam claims that the first sentence of Paragraph 16(a) of the Agreement, which reads, "[a]ny and all existing patent rights for the units or any of its component parts shall be the sole and exclusive property and/or responsibility of Mr. Coffee,"

(Ex. 59), effectively assigned the Design Patent to Mr. Coffee.

■■■ First, Sunbeam claims that since Kopaskie executed the Agreement on July 13, 1992, the same date that Sham applied for the Design Patent, the patent application relating to the Design Patent was an "existing patent right" as of that date and was therefore assigned to Sunbeam. However, the Agreement clearly states that it is made as of June 22, 1992. The Sixth Circuit has held that "Kentucky law clearly allows parties to a contract to predate a contract and both parties will be bound by that agreement." *C.T. Massey v. Exxon Corp.*, 942 F.2d 340, 344 (6th Cir.1991). "New York accepts the principle that, in some circumstances, parties to a contract may bind themselves retroactively." *Debreceni v. The Outlet Co.*, 784 F.2d 13, 18 (1st Cir.1986). "When a written contract provides that it shall be effective 'as of' an earlier date, it generally is retroactive to the earlier date." *Viacom Int'l, Inc. v. Tandem Prod., Inc.*, 368 F.Supp. 1264, 1270 (S.D.N.Y.1974). Given that a predated contract is effective retroactively, the phrase "existing patent rights" only applies to those patent rights, if any, that were in existence on June 22, 1992, the date that the Agreement was effective. Since neither the patent application for the Design Patent, which was filed on July 13, 1992, nor the Design Patent itself, which was issued by the United States Patent and Trademark Office on July 12, 1994, was extant prior to June 22, 1992, the date of the Agreement, neither the patent nor the patent application was captured by the phrase "existing patent rights."

---

**3.** Actual notice of the infringement of the Design Patent was provided to Sunbeam upon the filing of the District Court Action on February 9, 2001. Sunbeam acknowledged receipt of such actual notice upon the filing of this Adversary Proceeding.

■ Sunbeam argues that the phrase "existing patent rights" also includes the right to apply for a patent, thereby causing such right to be assigned to Mr. Coffee pursuant to the Agreement. This Court finds that the language found in the Agreement and in the relevant case law supports the conclusion that "existing patent rights" does not include the right to apply for a patent.

Wing Shing's argument that an idea or unfiled patent application is not an "existing patent right" is supported by the United States Court of Appeals for the Federal Circuit, which notes in *Gasser Chair Co., Inc. v. Infanti Chair Mnf. Corp.*, 60 F.3d 770, 777 (Fed.Cir.1995), *"[u]nlike patent rights, which arise at issuance of the patent,* rights in trade dress arise when the overall appearance attains recognition and association among the relevant consumer groups." (emphasis added). This proposition is further supported by *Fulmer v. United States,* 83 F.Supp. 137, 151 (N.D.Ala.1949) (citing *Gayler v. Wilder,* 51 U.S. 477, 493, 10 How. 477, 13 L.Ed. 504 (U.S.N.Y.1851)), where the court opines that "an unpatented invention or idea is but an inchoate right and 'the inventor . . . certainly has no exclusive right to it until he obtains a patent . . . and no suit can be maintained . . . for using it before the patent is issued.'" At the very least, the proposition that the assignment of all "existing patent rights" captures the assignment of a mere idea or unfiled patent application is unsupported, absent some specific indication in the Agreement that such an assignment was intended. As further discussed below, the language of the Agreement does not suggest that the parties intended to assign either the idea or the unfiled patent application for the Design Patent.

Wing Shing also argues that neither an idea nor an unfiled application involves a property right capable of being transferred by an agreement. This proposition is supported by *Owen v. Paramount Prods., Inc.,* 41 F.Supp. 557, 560 (S.D.Cal. 1941), where the court reasoned that "[a]n instrument which does not purport to convey a present interest in an existing patent, or in one for which an application is pending, is not an assignment within the statute."

■ On the other hand, courts have held that "an assignment is not invalidated because the invention is assigned before the patent issues." *Kenyon v. Automatic Instrument Co.,* 160 F.2d 878, 882 (6th Cir.1947). Clearly there are circumstances in which patents or patent applications not yet in existence are assigned by one party to another. For example, employees frequently assign their rights to future patents and patent applications to employers through an invention assignment agreement. *See Toner v. Sobelman,* 86 F.Supp. 369, 378 (E.D.Pa.1949) (explaining that "[t]he employer may by contract obtain title to the patent where the employee sells in advance the fruits of his talent."). In *The Regents of the Univ. of New Mexico v. Knight,* 321 F.3d 1111, 1120 (Fed.Cir.2003), the court held that employee-defendants, inventors of certain biopharmaceutical inventions, were contractually obligated to assign certain patents to the University of New Mexico by virtue of the university's patent policy and of invention assignment agreements previously executed by such employees. *Regents* acknowledges that, while the initial ownership of a patent vests in the inventor, inventors may assign all or part of their interest in a patent through contract or patent policy. Although future patent rights were found to be assignable in *Toner* and *Regents,* any such assignment should be made explicitly in the applicable contract. In the case at hand, the Agree-

ment provides only for the assignment of "existing patent rights." On its face the Agreement calls for the assignment of patents and possibly patent applications, but it does not explicitly assign rights to future patents or patent applications. Since the assignment of "existing patent rights" does not capture a mere idea or an unfiled patent application, the assignment of rights to future patents or patent applications need be specifically referenced if such an assignment were to take place.

Sunbeam references a number of cases to support its argument that the right to apply for a patent is an "existing patent right." However, each of these cases is distinguishable from the facts of this litigation. First, Sunbeam discusses *Meehan v. PPG Indus., Inc.*, 802 F.2d 881, 885 (7th Cir.1986), where the court rejected the argument that the right to apply for a patent is not a patent right as "but semantics." However, the court in *Meehan* goes on to state that "[t]he parties' anticipation and expectation of an issued patent appear throughout the contract." *Id.* at 886. In the present case, the Agreement does not contemplate the issuance of the Design Patent, and there is no indication within the four corners of the Agreement of any intention to assign a future design patent that might be applied for or issued. In fact, the Agreement's language and terms suggest that the Design Patent was not assigned to Sunbeam in Paragraph 16(a).

Paragraph 16(d) provides that Wing Shing will not ship into the United States, Canada or Mexico any item embodying the aesthetic visual design or any design similar to the AD Coffeemaker. It also provides the Wing Shing will not sell any item having the same aesthetic visual design or any design similar to the AD Coffeemaker to any other Wing Shing customer if such customer intends to market the item in the United States, Canada or Mexico. If the

Agreement contemplated the assignment of a future design patent, these restrictions placed on Wing Shing's ability to sell an item with the same or similar aesthetic visual design would have been superfluous. The parties in *Meehan* made clear that they anticipated the issuance of a design patent, making the assignment of that anticipated patent a logical extension of the assignment rights. No such reference to an anticipated design patent was made in the Agreement, nor does the language or the terms of the Agreement imply that a contemplated design patent would be assigned to Mr. Coffee.

Sunbeam also relies on *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1267 (Fed.Cir.1986), where the defendant argued that the assignment of "all his [inventor's] rights in the puzzle invention" included "an assignment or sale of the rights in the invention and the potential patent rights." The case at hand is distinguishable from *Moleculon* in that the phrase "all of his rights" is a significantly broader assignment of rights than "existing patent rights." Whereas the former arguably captures any and all rights that an inventor might have in an invention, the latter, absent further indication in the Agreement that an idea or unfiled patent was intended to be assigned, effectively narrows the scope of the assignment.

Finally, Blackwell's testimony supports this Court's conclusion that Mr. Coffee did not understand "existing patent rights" to include the idea or unfiled patent application for the Design Patent:

Q: If you had known in January of 1992 that Mr. Sham intended to apply for a patent on the product which is depicted in Exhibit J, a design patent, what would you have done?

A: ... I would have to think about it a little bit first. It would have changed

definitely the way that we viewed this project.

Q: How?

A: Well, for one thing, we would have made it clear, would have gotten a waiver from Mr. Sham on the rights to use that design. We never would have gone into a situation where somebody was patenting something we were going to buy what it is they had patented without having license to utilize that patent . . . we would have taken steps to have covered that in here with probably adding a clause to the effect of, as Mr. Sham intends to patent this design, it is hereby known that Mr. Coffee is allowed to use this design in all of our products and variations of it.

Blackwell Dep. p. 141:21–143:3.

If Mr. Coffee had understood "existing patent rights" to include the idea or unfiled patent application for the Design Patent, there would not have been any need for a modification of the Agreement's final language as suggested by Blackwell. The fact that Blackwell acknowledges that Mr. Coffee would have required changes to the Agreement had it known that Sham intended to apply for the Design Patent amounts to an admission by Sunbeam that the meaning of "existing patent rights" should be read narrowly.

The Court finds that the assignment of any and all "existing patent rights" does not include the assignment of the idea or the unfiled patent application for the Design Patent. Therefore, the Design Patent was not effectively assigned to Mr. Coffee by Paragraph 16(a) of the Agreement.

*2. Duty to Negotiate Patent Rights*

Sunbeam argues that Paragraph 16(a) imposes an obligation on Wing Shing to negotiate patent rights with Mr. Coffee/Sunbeam for jointly developed patents. Sunbeam contends that Wing Shing is in

breach of the Agreement since it did not negotiate patent rights relating to the Design Patent prior to applying for the Design Patent. However, this Court finds that Wing Shing is not in violation of the Agreement because: (i) the statute of limitations on any obligation that Wing Shing had to negotiate patent rights on the Design Patent terminated prior to the filing of this action; and (ii) as discussed in Section (IV)(C) herein, Mr. Coffee is not a co-inventor of the Design Patent, thus defeating Sunbeam's claim that the Design Patent was "jointly developed" by Mr. Coffee and Wing Shing.

■ The parties dispute the events that triggered the running of a six-year statute of limitations, pursuant to N.Y. C.P.L.R. § 213 (McKinney 2003), on Wing Shing's obligation to negotiate patent rights with Mr. Coffee. Paragraph 16(a) of the Agreement states, "[i]n the event that Mr. Coffee and Contractor jointly develop a patentable item both parties agree to negotiate patent rights prior to applying for the patent." Sunbeam argues that the earliest date on which Wing Shing breached this provision of the Agreement was March 9, 1995, less than six years before this action was filed. Sunbeam reasons that Wing Shing's transmittal of the March 9, 1995 Fax to Mr. Coffee on that date, claiming that it possessed the Design Patent, was the earliest manifestation of Wing Shing's ownership of the Design Patent, and thus the six-year statute of limitations commenced at that time. However, this Court finds that if Wing Shing did in fact have a responsibility to Mr. Coffee to negotiate the patent rights for the Design Patent, that obligation was breached by the filing of the application for the Design Patent. Since the application for the Design Patent was filed on July 13, 1992, and the Agreement was dated as of June 22, 1992, the clause was breached either upon

the filing of the application for the Design Patent or upon the execution of the Agreement by Kopaskie on July 13, 1992, whichever happened later.

 Sunbeam reasons that Sham's application for the patent in his own name was not in breach of the Agreement since, relying on *Frigi–Griffin, Inc. v. Leeds*, 52 A.D.2d 805, 383 N.Y.S.2d 339, 341 (N.Y.App.Div. 1 Dept. 1976), Sunbeam claims that a cause of action against a patentee does not accrue when a patent application has been filed, but rather when ownership of a patent is in dispute. However, *Frigi–Griffin* is distinguishable from the present cause of action in that here the breach of contract is not tied to the dispute of the patent's ownership, but rather to Wing Shing's alleged failure to negotiate the patent rights for the Design Patent before filing a patent application. If Wing Shing was obligated to negotiate the disputed patent rights, then it would have breached the Agreement when Sham filed the patent application on July 13, 1992 without first entering into negotiations. Pursuant to New York law, a "cause of action for breach of contact accrues and the statute of limitations commences when the contract is breached." *T & N PLC v. Fred S. James & Co. of New York, Inc.*, 29 F.3d 57, 59 (2nd Cir.1994). *See also Raine v. RKO General, Inc.*, 138 F.3d 90, 93 (2nd Cir.1998). Furthermore, knowledge of the breach on the part of the plaintiff is not required to start the statute of limitations running in a contract action. *See T & N PLC*, 29 F.3d at 60. *See also Royal Ins. Co. of Am. v. RU–VAL Elec. Corp.*, 918 F.Supp. 647, 656 (E.D.N.Y.1996). Since the alleged breach of contract would have occurred when Sham filed a patent application for the Design Patent without first negotiating with Mr. Coffee, the statute of limitations would have commenced upon the later of such filing or the execution of the Agreement, and would have run for more than six years prior to the filing of this action in either case.

 Sunbeam asserts that Wing Shing's conduct, including Wing Shing's failure to inform Mr. Coffee that Sham was filing an application for the Design Patent, caused Mr. Coffee/Sunbeam to fail to bring a breach of contract action in a timely fashion, thus estopping Wing Shing from relying upon a statute of limitations defense. *See Eagle Comtronics, Inc. v. Pico Prods., Inc.*, 256 A.D.2d 1202, 1204, 682 N.Y.S.2d 505 (N.Y.App. Div. 4 Dept. 1998). However, by Sunbeam's own admission, Mr. Coffee knew, or should have known, by March 9, 1995 at the latest, upon receipt of the March 9, 1995 Fax in which Wing Shing described its ownership interest in the Design Patent, that Wing Shing had applied for and obtained the Design Patent. Despite this knowledge, Sunbeam did not bring suit for breach of contract at that time. Having failed to bring suit until now, despite having knowledge of the alleged contract breach, Sunbeam cannot claim at present that it was prevented from bringing action as a result of Wing Shing's misconduct.

Moreover, since the Court finds in Section (IV)(C) below that Sunbeam was not a joint inventor of the Design Patent, Wing Shing did not have an obligation to negotiate the rights to such Design Patent. Given that Sunbeam was not a co-inventor, the Design Patent should not be considered jointly developed by the parties, rendering Wing Shing's obligation to negotiate pursuant to Paragraph 16(a) of the Agreement irrelevant in this instance.

### 3. Exclusivity of License

 Sunbeam claims that it has an "indefinite, exclusive license" for the Design Patent. Paragraph 17 of the Agreement stipulates that "Mr. Coffee shall have an

exclusive license to market and sell the Products, and any additional items added to the Products in accordance with the terms of this Agreement, specified herein and derivatives in North America (USA, Canada, Mexico)." This contrasts with the language found in the "Terms" section of the Performance and Product Specification exhibit (the "Specification Exhibit") attached to the Agreement, which states, "Mr. Coffee, inc. [sic], shall have indefinite exclusive rights to sale of this appliance, and its derivatives, in the United States, Canada, and Mexico." Despite the fact that the Specification Exhibit uses the word "indefinite," it is the exclusivity clause found in the Agreement, not in the Specification Exhibit, that is binding on the parties.

 Under Ohio law, when the terms of a contract are unambiguous, they are to be given their ordinary meaning without further interpretation by the court. *See Hamilton Ins. Servs.*, 86 Ohio St.3d at 273, 714 N.E.2d 898. *See also Ohio Historical Soc'y*, 65 Ohio App.3d 139 at 146, 583 N.E.2d 340. Paragraph 1 of the Agreement states, "[c]ontractor shall sell the Products to Mr. Coffee in accordance with the specifications provided herein and in the Performance and Product Specification attached hereto as Exhibit 1." According to this language of the Agreement, the Specification Exhibit is incorporated into the Agreement for the sole purpose of providing the specifications of the AD Coffeemakers. The summary of terms provided in the Specification Exhibit does not govern the relationship between the parties, and it does not override the terms set forth in the body of the Agreement. Although there is a disparity between Paragraph 17 of the Agreement, which grants Mr. Coffee an "exclusive license," and the terms set forth in the Specification Exhibit, which provide for "indefinite exclusive

rights," the terms provided in the Agreement are the operative terms.

 Paragraph 4(a) of the Agreement expressly states that "[t]he term of this Agreement shall begin on January 7, 1992 and shall extend through December 31, 1994, unless such Term is terminated prior to such date in accordance with the terms of this Agreement." The Agreement makes clear that it terminated on December 31, 1994. Even if the terms of the Specification Exhibit did govern the relationship between the parties, the phrase "indefinite exclusive rights" does not equate to the grant of a perpetual exclusive license. Black's Law Dictionary defines "indefinite" as "[w]ithout fixed boundaries ... indefinite contemplates that condition will end at unpredictable time, whereas 'permanent' does not contemplate that condition will cease to exist." Black's Law Dictionary 769 (6th ed.1990). Taken in concert with Paragraph 4(a) of the Agreement, "indefinite exclusive rights" would mean December 31, 1994, *or such earlier time that the Agreement might be terminated.* Since the Agreement is terminable by Mr. Coffee upon ninety days written notice, the license granted to Mr. Coffee could be construed as lasting for an indefinite period of time with an outside termination date of December 31, 1994. However, the term "indefinite exclusive rights" fails to grant a perpetual license extending beyond the term specifically stated in the Agreement.

Once again, this reading of the Agreement is supported by the testimony of Jeffrey Blackwell. When asked in deposition, "[i]f you had known in January of 1992 that Mr. Sham intended to apply for a patent on the product which is depicted in Exhibit J, a design patent, what would you have done?," Blackwell responded:

A: ... I would have to think about it a little bit first. It would have changed

definitely the way that we viewed this project.

Q: How?

A: Well, for one thing, we would have made it clear, would have gotten a waiver from Mr. Sham on the rights to use that design. We never would have gone into a situation where somebody was patenting something we were going to buy what it is they had patented without having license to utilize that patent ... we would have taken steps to have covered that in here with probably adding a clause to the effect of, as Mr. Sham intends to patent this design, it is hereby known that Mr. Coffee is allowed to use this design in all of our products and variations of it.

Blackwell Dep. p. 141:23–143:3.

Blackwell's deposition indicates that Mr. Coffee did not perceive the Agreement as granting Mr. Coffee a perpetual exclusive license for the AD Coffeemaker, as evidenced by his acknowledgment that Mr. Coffee would have drafted a more comprehensive license provision had it realized that Sham was filing an application for the Design Patent. This testimony supports the Court's finding that the Agreement did not grant a perpetual exclusive license to Mr. Coffee.

■■■ Sunbeam contends that the parties have continued to perform under the terms of the Agreement until the present day, thereby rendering their implied consent to the Agreement remaining in place. This Court finds that there is no evidence that the parties intended for the Agree-

ment to remain in effect beyond December 31, 1994. Paragraph 26 of the initial draft of the Agreement provided that "[t]his Agreement shall continue from year to year so long as the parties agree to proceed with additional purchase orders or until either party terminates the Agreement." (Ex. Q). This language was removed from the final execution copy of the Agreement and replaced with a definitive termination date without provision for automatic renewal. Moreover, Paragraph 23(h) of the Agreement provides that "[t]his Agreement may not be changed orally, but may be amended, superceded, canceled, renewed or extended ... only by an instrument in writing signed by each of the parties." Absent such a writing, there is no basis for the claim that the Agreement has been extended through the present. The fact that the parties continued their business relationship does not indicate that the term of the Agreement was extended, but rather that the parties conducted business outside of the authority of a written contract. Therefore, this Court holds that Sunbeam does not have an indefinite exclusive license for the AD Coffeemaker.

C. Joint Inventorship of AD Coffeemaker [4]

■■■ Sunbeam argues that, since Mr. Coffee's employees were co-inventors of the Design Patent, Sunbeam is a co-owner of the Design Patent and is thus entitled to its unlimited use. A patented invention may be the work of two or more joint inventors. See 35 U.S.C. § 116

---

[4] Wing Shing contends that Sunbeam is prevented by the doctrine of laches from claiming that Mr. Coffee was a co-inventor of the AD Coffeemaker. The Court does find support in case law for the proposition that there is not a time limit set on a court's ability to correct the inventorship of an issued patent. See Advanced Cardiovascular Sys., Inc. v.

Scimed Life Sys., Inc., 988 F.2d 1157, 1162 (Fed.Cir.1993). See also Ethicon, Inc. v. United States Surgical Corp., 954 F.Supp. 51, 54 (D.Conn.1997). However, the Court need not further address this issue, since it is rendered irrelevant by the Court's holding that Mr. Coffee was not a co-inventor of the AD Coffeemaker.

(1994). *See also Ethicon v. United States Surgical Corp.*, 135 F.3d 1456, 1459–60 (Fed.Cir.1998). In conceiving a joint invention, each of the joint inventors need not "make the same type or amount of contribution" to the invention. *See* 35 U.S.C. § 116 (1994); *also Ethicon*, 135 F.3d at 1460; *Burroughs Wellcome Co. v. Novopharm, Inc.*, 40 F.3d 1223, 1227 (Fed. Cir.1994). Each joint inventor must perform only a portion of the task which produces the invention. However, "one does not qualify as a joint inventor by merely assisting the actual inventor after conception of the invention claimed." *Ethicon*, 135 F.3d at 1460. To qualify as a joint inventor, one must: (i) contribute in some significant manner to the conception or reduction to practice of the invention; (ii) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention; and (iii) do more than merely explain to the real inventors well-known concepts and/or the current state of the art. *See Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed.Cir.1998). *See also Kosower v. Gutowitz*, No. 00 Civ. 9011, 2001 WL 1488440, at *7, 2001 U.S. Dist. LEXIS 19111, at *22 (S.D.N.Y. November 21, 2001). Additionally, "[t]o show co-inventorship ... the alleged co-inventor or co-inventors must prove their contribution to the conception of the claims by clear and convincing evidence." *Ethicon*, 135 F.3d at 1461.

■■■ Sunbeam alleges that Mr. Coffee made certain specific contributions to the Design Patent. In order to determine whether Mr. Coffee's contributions rise to the level of joint inventorship, it is necessary to examine such alleged contributions separately and in concert to establish whether Mr. Coffee's changes make Sunbeam a co-inventor of the Design Patent.

### 1. State of the Art Changes

Patent law provides that "[o]ne who simply provides the inventor with well-known principles or explains the state of the art without ever having 'a firm and definite idea' of the claimed combination as a whole does not qualify as a joint inventor." *Ethicon*, 135 F.3d at 1460. An alleged joint inventor must "do more than merely explain to the real inventors well-known concepts and/or the current state of the art." *Pannu*, 155 F.3d at 1351. Certain changes requested by Mr. Coffee qualify as well-known concepts and current state of the art.

*Elimination of the grooves on the brew basket and the ridges on the reservoir cover:* The coffeemaker proposed by Wing Shing had grooves on its brew basket and ridges on its reservoir cover. Sunbeam requested that the grooves and ridges be removed from the AD Coffeemaker. When queried in her deposition as to how many coffeemakers in the market in 1991 had a smooth reservoir cover, Kim Pastrick ("Pastrick"), a former Mr. Coffee employee, answered:

A: Most of them.

Q: And can you recall how many coffeemakers were on the market in the fall of 1991 that had a smooth brew basket?

A: Most of them.

Q: And when you say most of them, can you give me any brand names that you recall?

A: Proctor Silex, Krupps, Braun, West Bend, Salton. That's what I remember right now.

Pastrick Dep. p. 51:16–52:2.

Given the number of coffeemakers on the market that had smooth reservoir covers and brew baskets at the time the AD Coffeemaker was designed, Mr. Coffee's request to remove the ridges from the reservoir and the brew basket amounts to

a well-known concept in the design of coffeemakers. Therefore, Mr. Coffee's suggestion to remove these grooves cannot be considered a conception rising to the level of inventorship, nor does this contribution support Mr. Coffee's claim of co-inventorship.

### 2. Functional Changes

██ Case law has established that, although a design patent may embody functional features, *See Tone Brothers, Inc. v. Sysco Corp.*, 28 F.3d 1192, 1199 (Fed.Cir. 1994), a design patent only protects the novel, ornamental features of the patented design. *See OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed.Cir. 1997). *See also Lee v. Dayton–Hudson Corp.*, 838 F.2d 1186, 1188 (Fed.Cir.1988). "Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *OddzOn*, 122 F.3d at 1405. In *Lee*, the court articulated the policy considerations behind culling the functional elements from the scope of a design patent: "[t]o hold that general configuration made necessary by function must give to a patented design such breadth as to include everything of similar configuration, would be to subvert the purpose of the law, which is to promote the decorative arts." *Lee*, 838 F.2d at 1188 (quoting *Accord Applied Arts Corp. v. Grand Rapids Metalcraft Corp.*, 67 F.2d 428, 430 (6th Cir.1933)).

The Supreme Court has defined a product feature as functional if "it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). This Court is of the opinion that the remainder of the changes suggested by Mr. Coffee to the AD Coffeemaker are functional in nature, and are therefore beyond the scope of the Design Patent.

*Moving the power switch to the column:* Mr. Coffee proposed that the power switch be moved from the base of the AD Coffeemaker to its side. This change prevented water from leaking into the switch and causing potential electrical and other safety hazards. When asked in her deposition why she suggested removing the power switch from the base and putting it on the side, Pastrick acknowledged that "[t]he main reason is that it's a safety hazard. It's difficult with the water—water could get into the switch. It could cause more problems." (Pastrick Dep. p. 40:20–23). Pastrick's testimony indicates that this change was primarily functional and rooted in safety concerns.

*Opening the brew basket from left to right:* Mr. Coffee requested that the brew basket open from left to right rather than right to left. This change was made because the majority of consumers are right-handed. (Tr. 12/11/01 p. 31:11–18). Jeffrey Blackwell testified that this change was functional in nature. (Tr. 12/12/01 p. 137:11–18).

*Moving the water-level gauge from the right to left side:* Mr. Coffee suggested moving the water-level gauge from the right to the left side of the brew basket in conjunction with changing the brew basket so that it opened from left to right. This was also a functional change determined by the placement of the brew basket's hinge. (Tr. 12/12/01 p. 139:24–140:6).

*Inserting a bottom metal plate:* Mr. Coffee suggested inserting a steel plate in the bottom of the AD Coffeemaker. Mr. Coffee also provided Wing Shing with a sample steel plate from Mr. Coffee's IDS40 coffeemaker as a proposed model. The purpose of this metal plate was to protect the surface underneath the AD

Coffeemaker in the event of a thermostat failure. (Tr. 12/12/01 p. 103:8–16). This was primarily a safety-related, not an ornamental, change. (Tr. 12/12/01 p. 103:10–12; Tr. 12/11/01 p. 32:7–14). The plate was designed in the shape of a horseshoe as opposed to covering the entire base of the AD Coffeemaker because the latter approach required the use of more metal and was therefore costlier to produce. (Tr. 12/11/01 p. 33:3–4). The use and shape of this metal plate were dictated by safety and price-related factors as opposed to ornamental considerations.

*Adding a shroud to the power switch:* Mr. Coffee suggested adding a shroud to the power switch in order to prevent water from leaking into the power switch. (Tr. 12/11/01 p. 34:16–18; Tr. 12/12/01 p. 137:24–138:3). Blackwell admitted in his testimony that this was a functional change. (Tr. 12/12/01 p. 138:4–6).

Since the above changes are functional and not ornamental in nature, the Court holds that they do not fall within the scope of the Design Patent and do not individually support Sunbeam's claim of co-inventorship.

### 3. Contributions to Overall Appearance of the Design Patent

Sunbeam argues that in determining whether Mr. Coffee was a co-inventor of the Design Patent, the Court should look to Mr. Coffee's contribution to the overall appearance of the design as opposed to the character of each individual contribution. Sunbeam relies on the Federal Circuit's assertion, found in *L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1123 (Fed. Cir.1993), that in determining whether a design is functional or ornamental in a design patent infringement dispute, "the ultimate question is not the functional or decorative aspect of each separate feature, but the overall appearance of the article."

However, *L.A. Gear* is distinguishable from the present case in that the present case deals with the requisite contribution for an individual to be considered a co-inventor of a design patent, whereas *L.A. Gear* addresses the standard to be applied when determining whether a patent has been infringed.

When determining whether an individual is a co-inventor of a design patent, the court must look towards the contributions that individual made to the novel, ornamental features of the design. In fact, *L.A. Gear* goes on to state, "[t]he elements of the design may indeed serve a utilitarian purpose, but it is the ornamental aspect that is the basis of the design patent." *Id.* at 1123. Since Mr. Coffee's contributions were all either well-known concepts or functional changes, they do not represent a contribution to the novel, ornamental features of the Design Patent. However, even if the Court was to give weight to the overall appearance of the Design Patent, including the well-known concepts and functional aspects proposed by Mr. Coffee, the Court finds that Mr. Coffee's contribution to the Design Patent was not significant enough in quality when measured against the dimension of the full invention so as to achieve co-inventor status. Therefore, even by Sunbeam's own standard, Mr. Coffee would not be considered a joint inventor of the Design Patent.

Sunbeam also relies on *Elmer v. ICC Fabricating, Inc.,* 67 F.3d 1571, 1577 (Fed.Cir.1995), in asserting that functional features are within the scope of a design patent: "If, as [plaintiff] now contends, the vertical ribs and upper protrusion were functional, not ornamental features, [plaintiff] could have omitted these features from its patent application drawings. [Plaintiff] did not do so, however, and thus effectively limited the scope of its patent claims by including those features

in it." The Court finds that Sunbeam has incorrectly applied this case in the current proceedings. Although *Elmer* holds that certain features that the *Elmer* plaintiff contends are functional are within the scope of a particular design patent, the court did not hold that the contribution of any feature appearing in a design patent makes a contributor a joint inventor. A design patent might be limited in scope by the features included therein, but this does not indicate that every feature will weigh in when determining inventorship. In fact, the court in *Elmer* specifically stated that, "[a] design patent protects the nonfunctional aspects of an ornamental design as shown in the patent," *Id.* at 1577, which supports this Court's holding that the contribution of strictly functional features as discussed above does not lead to joint inventorship of the Design Patent.

### 4. Summary

This Court holds that Sunbeam is not a co-inventor of the Design Patent. Mr. Coffee's contributions to the Design Patent were all either well-known concepts in the design of coffeemakers or strictly functional, and in making such contributions Mr. Coffee did not achieve co-inventor status. Furthermore, even if the Court was to look towards Mr. Coffee's contribution to the overall appearance of the Design Patent, Mr. Coffee's contribution to the ornamental characteristics of the Design Patent was not significant in quality when measured against the dimension of the full invention.

### D. Damages

The success of Sunbeam's laches defense and Wing Shing's failure to provide adequate notice of infringement, as discussed in Section (IV)(A) herein, results in Wing Shing's being entitled solely to post-suit damages. Damages in patent infringement cases are governed by 35 U.S.C. § 284. An additional remedy exists for design patents pursuant to 35 U.S.C. § 289. Section 284 provides for plaintiff's recovery of damages, whereas § 289 provides for plaintiff's recovery of the infringer's profits. Wing Shing has requested relief in the form of the greater of: (i) Sunbeam's total profits on its sales of the AD Coffeemakers pursuant to § 289; or (ii) Wing Shing's damages resulting from Sunbeam's sale of infringing AD Coffeemakers, trebled pursuant to § 284. Wing Shing is not entitled to recover under both theories:

> Certainly if defendant is required to pay a royalty for the right to make, use, and sell, he is not then to be deprived of his profits earned from such making, using, and selling. Conversely, if the infringer is to be deprived of its profits for unlawfully making, using, and selling, it is not to be charged a royalty for such making, using and selling, which has availed it nothing. The concepts of 'royalty' and 'infringer's profits' are contradictory.

*Sel–O–Rak Corp. v. Henry Hanger & Display Fixture Corp. of Am.,* 159 F.Supp. 769, 777 (S.D.Fla.1958).

### 1. Analysis Pursuant to § 284

35 U.S.C. § 284 provides that, "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Wing Shing claims that "but for" the infringing sales that Sunbeam made to Simatelex, Sunbeam would have purchased all of its model AD Non–Timer Units from Wing Shing. Therefore, Wing Shing asserts that the profits made by Simatelex equal the "lost profits" of Wing Shing. In order to support this "but

for" scenario, Wing Shing must satisfy the four-part test enumerated in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir.1978) as follows:

1) Demand for the patented product;
2) Absence of acceptable non-infringing substitutes;
3) Wing Shing's manufacturing and marketing ability to exploit the demand; and
4) The amount of profit Wing Shing would have made.

*See also Rocket Jewelry Box, Inc. v. Quality Int'l Packaging, Ltd.*, 250 F.Supp.2d at 338 (S.D.N.Y.2003).

■■■■■ This Court finds that Wing Shing has failed to satisfy the second prong of this test by establishing an absence of acceptable non-infringing substitutes. "An accurate reconstruction of the hypothetical 'but for' market takes into account any alternatives available to the infringer." *Grain Processing Corp. v. American Maize–Prods. Co.*, 185 F.3d 1341, 1351 (Fed.Cir.1999). If Sunbeam had been able to produce a viable non-infringing substitute for the AD Coffeemaker, Wing Shing would not be able to demonstrate that the sales that infringed the Design Patent were sales that Wing Shing would otherwise have made. Thus, Wing Shing's claim of lost profits would be defeated. The existence of a non-infringing substitute is a question of fact to be decided by the court. *See Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 166 F.Supp.2d 1008, 1029 (D.Del.2001). An infringer's possession of the necessary equipment, know-how and experience required to produce a non-infringing substitute are factors in determining whether such a substitute was available. *See Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1123 (Fed.Cir.2003).

Design patents have almost no scope. *See In re Mann*, 861 F.2d 1581, 1582 (Fed. Cir.1988). Thus, Mr. Coffee or Sunbeam could easily have made minor modifications to the ornamental design of the Design Patent and created a non-infringing alternative. Phillip Beutel ("Beutel") of National Economic Research Associates testified that Sunbeam could have chosen this redesign approach as a readily available alternative to continuing with the production of an infringing AD Coffeemaker. (Tr. 1/31/02 p. 135: 15–22). A modest redesign would have taken two months, whereas a more substantial redesign would have taken eight months. (Tr. 1/31/02 p. 176:19–22). Sunbeam did have the necessary equipment, know-how and experience required to make the minor modifications to the AD Coffeemaker necessary to construct a non-infringing design patent. The Court is of the opinion that such a redesign would have constituted a non-infringing product and would have provided an available alternative to the use of the Design Patent. Given the fact that design patents are narrow in scope, the redesigned product could have been ornamentally similar to the AD Coffeemaker without infringing the Design Patent.

Berreth also testified that Sunbeam had made a decision to curtail its business dealings with Wing Shing in stating: "for a number of business reasons we had decided to move out of [Wing Shing] as a supplier. We had had numerous quality problems and also legal problems with [Wing Shing]; so, we had made a conscious decision to look for other suppliers of basically all of the products [Wing Shing] was then manufacturing for us." (Tr. 12/12/01 p. 194:2–8).

Sunbeam's desire to limit Wing Shing's role as a supplier is further evidenced by the fact that the number of AD Coffeemakers that Sunbeam purchased from

Wing Shing declined by approximately 50% between 1999 and 2000. (Tr. 12/11/01 p. 171:12–16).

Sunbeam also makes clear the fact that it would not have sold a product, when another entity held the patent to such product, without having a license to utilize that patent. (Blackwell Dep. p. 142:13–18) (stating "[w]e never would have gone into a situation where somebody was patenting something we were going to buy what it is they had patented without having a license to utilize that patent. That would be rather stupid as business people."). Sunbeam valued the ability to dual source its products, and it has established that it would not have accepted a scenario where it did not at least have the option of doing so. (Tr. 1/31/02 p. 161:2–5).

The ease with which Sunbeam could have designed around the Design Patent, coupled with the friction that existed between Sunbeam and Wing Shing and Sunbeam's desire to be able to dual source its products, renders it not only possible, but also likely, that Sunbeam would have chosen to design around the Design Patent rather than direct all of its AD Coffeemaker sourcing to Wing Shing. This Court finds that the redesign of the AD Coffeemaker was a viable and acceptable non-infringing substitute to the continued production of the AD Coffeemaker, thereby precluding Wing Shing's recovery of the total profits made by Simatelex as "lost profits" during the infringing period. Even apart from the *Panduit* test, the Court is not convinced that, but for the infringement of the Design Patent, Sunbeam would have directed more sales to Wing Shing. Therefore, Wing Shing fails to demonstrate lost profits under § 284.

■ The Court must then determine the "reasonable royalty" that Sunbeam would have paid to Wing Shing for use of the Design Patent. A "reasonable royal-

ty" contemplates a hypothetical negotiation between the patentee and the infringer at a time before the infringement began. This analysis necessarily involves some approximation of the market as it would have hypothetically developed absent infringement, and also requires an economic and factual basis to build upon. *See Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302, 1311 (Fed.Cir.2002).

■ The Court finds Beutel's testimony helpful in constructing this hypothetical negotiation. Hypothetically, in the event that Sunbeam had approached Wing Shing to license the AD Coffeemaker prior to infringement, Wing Shing would have had two options to consider. The first would have been to deny the license. Under this scenario Sunbeam would likely have designed around the AD Coffeemaker and, given that there were other comparable manufacturers with whom Sunbeam could have conducted business, (Tr. 1/31/02 p. 153:5–19), shifted its business away from Wing Shing. By denying the license, Wing Shing stood to lose more than it likely would have gained. Thus, as a rational economic agent, Wing Shing probably would have chosen to grant the license for a reasonable royalty, thereby deriving continued economic benefit from the Design Patent and from whatever ongoing business would be provided by Sunbeam as a major customer. (Tr. 1/31/02 p. 152:16:24).

In this hypothetical scenario, Sunbeam, as a rational economic agent, would be willing to pay for the license up to that amount that it would cost for Sunbeam to design around the Design Patent, plus a premium for avoiding: (i) disruptions to business that might be caused when making minor changes to the design of the AD Coffeemaker; (ii) the incurrence of risk in introducing a modified product; and (iii) having to alert store buyers and manufac-

turers of the modified product. Beutel testified that, to change the molding of the AD Coffeemaker to incorporate the ornamental changes necessary to design around the Design Patent, it would cost Sunbeam "no more than $32,000. It could be less, but certainly no more than $32,000." (Tr. 1/31/02 p. 151:9–10). Beutel also testified that a complete reworking of the design of the AD Coffeemaker, such that all of the exterior components of the coffeemaker were affected, would cost no more than $173,000. (Tr. 1/31/02 p. 151:17–19). Since, as previously mentioned, design patents are narrow in scope, the Court finds that Sunbeam need only have made minor changes to the Design Patent in order to avoid future infringement. Therefore, Sunbeam could have relied on the less expensive, $32,000, design alternative in developing a non-infringing product. With Sunbeam having the option of relying upon a $32,000 redesign effort to avoid infringement, it is unlikely that it would have been willing to pay substantially more than that amount to license the Design Patent. The Court is unable to ascertain the exact premium that Sunbeam would have paid to avoid having to redesign the AD Coffeemaker, but in no event is the Court able to envision this premium increasing the total payment for the license beyond the $173,000 that Sunbeam would have paid to completely overhaul the Design Patent and develop a new product line. Therefore, for purposes of determining a reasonable royalty pursuant to § 284, the Court holds that such reasonable royalty would amount to a minimum of $32,000 and a maximum of $173,000. Under no circumstances does this Court envision Sunbeam paying a percentage of sales for a license that it could easily have designed around.

▆▆▆ The rate of interest to be awarded under § 284 is left to the discre-

tion of the court. *See BIC Corp. v. First Prominence Co.*, No. 00 Civ. 7155, 2001 WL 1597983, at *3, 2001 U.S. Dist. LEXIS 20734, at *9 (S.D.N.Y. Dec. 10, 2001). "A commonly accepted prejudgment interest rate in patent damages cases is the prime rate." *Id.* at *3. *See also Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 939 F.2d 1540, 1545 (Fed.Cir.1991) ("A trial court is afforded wide latitude in the selection of interest rates, and may award interest at or above the prime rate."). This Court finds that the prime rate is a reasonable rate of prejudgment interest in this case. The prejudgment interest at the prime rate on $32,000, compounded daily from February 9, 2001 to the date of this Memorandum Decision, is $4,112.34. The prejudgment interest at the prime rate on $173,000, compounded daily from February 9, 2001 to the date of this Memorandum Decision, is $22,232.32.

### a. Discussion on Treble Damages

▆▆▆ 35 U.S.C. § 284 also provides that the Court may increase damages up to three times the amount found or assessed. The decision to award damages and the amount of such damages is a matter for the discretion of the court. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed.Cir.1992) ("An award of enhanced damages for infringement, as well as the extent of the enhancement, is committed to the discretion of the trial court."). In determining whether or not to award damages, this Court must look towards Sunbeam's conduct in light of the facts and circumstances of the case. "The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Id.* at 826.

▆▆▆ Based on the evidence presented, this Court cannot justify the award of tre-

ble damages to Wing Shing. Sham testified that Wing Shing was willing to accept Sunbeam's infringement of the Design Patent in order to avoid a confrontation with Sunbeam, a major Wing Shing customer. (Tr. 12/11/01 p. 146:14–147:14). Sham also testified that he specifically instructed a Wing Shing employee in March 1995 not to inform Sunbeam of the infringement or to request that Sunbeam cease and desist buying AD Coffeemakers from Simatelex because he did not want to "fight" with Sunbeam. (Tr. 12/11/01 p. 145:17–146:8). Having tolerated the infringement of the Design Patent for a lengthy period of time in order to maintain its business relationship with Sunbeam, it would be unreasonable for Wing Shing to expect to be awarded enhanced damages of any kind. Wing Shing enjoyed the fruits of its dealings with Sunbeam for almost a decade, and only brought suit when its sales to Sunbeam declined and after Sunbeam filed for chapter 11 protection. Given this set of facts and circumstances, this Court denies Wing Shing's request for treble damages.

### 2. Analysis Pursuant to § 289

■ 35 U.S.C. § 289 provides for a further remedy for design patents in an amount equal to the total profit of the infringer. Under § 289, an infringer "shall be liable to the [patent holder] to the extent of his total profit, but not less than $250." 35 U.S.C. § 289. Once a patent owner establishes the amount of infringing sales, the burden shifts to the infringer to demonstrate the nature and amount of the costs that should be considered in calculating its "total profits," as well as their relationship to the infringing product. See Bergstrom v. Sears, Roebuck and Co., 496 F.Supp. 476, 497 (D.Minn.3d.1980). For purposes of determining the amount of Sunbeam's infringing sales, Sunbeam has provided sales figures which Wing Shing has used in its proffered calculation of Sunbeam's total profits. However, the sales figures as provided extend only through the first quarter of 2001. In order to determine Sunbeam's actual profit, it is necessary for Sunbeam to provide Wing Shing and the Court with the appropriate sales figures for the infringing products from February 9, 2001, the date that the District Court Action commenced and actual notice was given, through the date of the cessation of the infringement.

Wing Shing has argued that the only costs that should be subtracted from the gross sales figures in order to arrive at Sunbeam's profits derived from the infringing products are the product cost of sales, freight and warranty return provisions. (Tr. 1/31/02 p. 120:23–121:4). In Sunbeam's computation of its profits derived from the infringing profits, Sunbeam asserts that its fixed costs incurred in connection with the production of the AD Coffeemakers should be deducted from the gross sales figures as well.

■ The inclusion or exclusion of fixed costs is a matter for the Court to determine in its discretion. "For design patent cases, authority on the calculation of fixed expenses is scant, thus requiring the Court to use discretion." Rocket, 250 F.Supp.2d at 340. "Neither case law nor logic provides a clear rule for the proper treatment of fixed expenses in computing an award of profits." Schnadig Corp. v. Gaines Manufacturing Co., Inc., 620 F.2d 1166, 1172 (6th Cir.1980). "No fast and hard rules should or can be stated to guide application of this general rule to the infinite variety of fact situations developed in different cases." Id. at 1173. Courts have treated the decision as to whether fixed expenses should be deducted from total costs as a question of fact. "These contentions [deductions allowed in the computa-

tion of net profits] involve questions of fact." *Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 409, 60 S.Ct. 681, 84 L.Ed. 825 (1940). "Although the proper treatment of fixed expenses can be viewed as a question of law, most courts have perceived the real questions to be the relationship between the particular fixed costs and the infringing production in each case, and this has been treated as a question of fact." *Schnadig,* 620 F.2d at 1174.

 Sunbeam has produced a proforma P & L statement (the "Simatelex Pro–Forma"), marked as SW 1225 of Exhibit AP, (Ex. AP), demonstrating the sales and expenses associated with the infringing Simatelex-produced AD Coffeemakers. This Court must determine which categories of fixed expense are deductible, and then allocate a portion of such expenses to the infringing AD Coffeemakers. *"Sheldon* requires a court to (1) determine what categories of expenses are deductible based upon their nexus to the production of the infringing product, and (2) fairly allocate a portion of that overhead to the infringing item." *Rocket,* 250 F.Supp.2d at 341. *See also Hamil Am., Inc. v. GFI, Inc.,* 193 F.3d 92, 105–106 (2d Cir.1999). Courts have held that those fixed costs that assist in the production of infringing products should be attributable to those products. " 'Overhead' which does not assist in the production of the infringement should not be credited to the infringer; that which does, should be; it is a question of fact in all cases." *Sheldon v. Metro–Goldwyn Pictures Corp.,* 106 F.2d

45, 54 (2d Cir.1939). *See also Wilkie v. Santly Bros., Inc.,* 139 F.2d 264, 265 (2d Cir.1943). "The fixed expenses are as necessary to the infringing production as are the variable expenses, and should be similarly treated." *Schnadig,* 620 F.2d at 1172. This Court finds that the costs set forth on the Simatelex Pro–Forma are properly attributable to the infringing AD Coffeemakers, with the exception of "Research & Development," "Goodwill & Trademark Amortization" and "Administrative," since the amount of these expenses directly attributable to the AD Coffeemakers is ambiguous and Sunbeam has not clarified the issue. The Court will also exclude "Special Charges/Other SG & A," "Other COS Special Charges," "E & O COS Adjustment" and "Reserve for E & O," since the nature of these items and their relation to the AD Coffeemakers is unclear to the Court and Sunbeam has not adequately explained them. The Court holds that the remainder of the line items are directly related to the AD Coffeemakers, and that the AD Coffeemakers could not have been brought to market without them.[5]

 Sunbeam bears the burden of presenting a formula for allocating fixed overhead that is fair and acceptable. "The infringer has the burden of 'offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue.' " *Hamil,* 193 F.3d at 105 (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.03[B], at 14–39 (1996)). It is then for

---

**5.** Wing Shing has argued that a court may award prejudgment interest on a claim pursuant to 35 U.S.C. § 289, despite the fact that prejudgment interest is not provided for in the statute. (Defendant Counterclaimant's Proposed Findings of Fact, Conclusions of Law, Permanent Injunction and Judgment at 97–98). Although the case law cited by Wing Shing does not articulate a clear standard for

awarding prejudgment interest under § 289, the Court has determined that the award of such prejudgment interest would be unreasonable in this instance for the same reasons that the Court outlined in declining treble damages under 35 U.S.C. § 284 in Section (IV)(D)(1)(a) above. As stated therein, the Court is of the opinion that Wing Shing's conduct does not warrant enhanced damages.

the Court to determine whether the proffered overhead allocation formula is reasonable. "The reasonableness of the proffered overhead allocation formula is a question of fact in all cases." *Hamil,* 193 F.3d at 105.

 Sunbeam has proposed that the method that should be employed in allocating fixed costs associated with the production of the AD Coffeemakers is to allocate costs as a percentage of sales. The Court finds that this is a fair and acceptable method of attributing fixed costs. The Court finds persuasive Sunbeam's argument that, since in the ordinary course of its business Sunbeam does not specifically keep track of accounting line items with respect to the AD Coffeemakers or with respect to particular suppliers, it would be an extremely difficult, and ultimately near impossible, task for Sunbeam to assign such line items to particular models or suppliers at present. (Tr. 12/12/01 p. 162:11–163:3). Given the difficulty that this process would entail, and given that Sunbeam ordinarily accounts for costs as a percent of sales (Tr. 12/12/01 p. 164:10–13), the Court holds that the assignment of costs as a percentage of sales is a reasonable method of assigning overhead to the infringing products.

### 3. Attorney's Fees Pursuant to 35 U.S.C. § 285

 Pursuant to 35 U.S.C. § 285, "[t]he Court in exceptional cases may award reasonable attorney fees to the prevailing party." Taking Wing Shing's conduct into account, the Court does not find that the case at hand is an exceptional case. "Bad faith litigation, willful infringement, or inequitable conduct are among the circumstances which may make a case exceptional." *Mahurkar v. C.R. Bard,* 79

F.3d 1572, 1579 (Fed.Cir.1996). The Court has determined that the award of attorneys fees under § 285 would be inappropriate and wholly unreasonable in this instance, for the same reasons that the Court outlined in declining treble damages under 35 U.S.C. § 284 in Section (IV)(D)(1)(a) above.

### 4. Summary

In order to determine Sunbeam's profits for the period of February 9, 2001, the date that the District Court Action was filed, through the date of entry of this judgment, Sunbeam is instructed to provide a pro-forma income statement, consistent with the Court's findings in this Section (IV)(D), setting forth its operating profits earned from the sale of the infringing AD Coffeemakers produced by Simatelex during such period. In the event that this amount is less than $195,232.32, the maximum royalty rate, including prejudgment interest,[6] that the Court has determined Wing Shing would be entitled to pursuant to 35 U.S.C. § 284, then the Court will have to solicit further facts from the parties to determine the actual royalty rate that Wing Shing should be entitled to. After the production of these results, Wing Shing shall ultimately be entitled to the greater of its lost profits pursuant to 35 U.S.C. § 284 or Sunbeam's total profits under 35 U.S.C. § 289, in accordance with the Court's findings in this Memorandum Decision. Wing Shing shall not be entitled to treble damages under 35 U.S.C. § 284, or to its attorney's fees.

### V. CONCLUSION

For the reasons set forth above, Sunbeam, its officers, agents, servants, employees and attorneys, and all those persons in active concert or participation with

---

**6.** As discussed in Footnote 5 above, the Court has determined that Wing Shing shall not be entitled to prejudgment interest in the event that Wing Shing recovers Sunbeam's total post-suit profits pursuant to 35 U.S.C. § 289.

them who receive actual notice of this order by personal service or otherwise be, and hereby are, permanently enjoined pursuant to 35 U.S.C. § 283 from: (i) infringing the Design Patent; and (ii) making, using, offering to sell, selling within the United States, or importing into the United States, any product making use of the Design Patent during the term of the Design Patent.

In addition, the claim of Wing Shing shall be allowed, without costs, in an amount to be determined pending Sunbeam's production of its operating profits earned from the post-suit sale of the infringing AD Coffeemakers produced by Simatelex, in accordance with this decision. Sunbeam is to submit a suitable pro-forma income statement within thirty days.

The claims of Sunbeam are dismissed with prejudice and without costs.

Wing Shing is hereby directed to submit to the Court an order on five days' notice consistent with this decision.