**SUNBEAM PRODUCTS, INC.,**
Appellant–Cross–Appellee,

v.

**WING SHING PRODUCTS (BVI) LTD.,** Appellee–
Cross–Appellant.

Nos. 03 Civ. 7190(RJH), 03 Civ. 7923(RJH), 04 Civ. 3347(RJH).

United States District Court, S.D. New York.

July 1, 2004.

Douglas J. Gilbert, Herbert F. Schwartz, Fish & Neave, Kevin P. Hughes, Nicholas P. Groombridge, Weil, Gotshal & Manges, L.L.P., New York City, for appellant.

William Irvin Dunnegan, Ronald Lee Zaslow, Perkins & Dunnegan, New York City, for appellee.

### *MEMORANDUM OPINION AND ORDER*

HOLWELL, District Judge.

This matter comes before the Court as an appeal from a memorandum decision of the Bankruptcy Court dismissing the claims of Appellant–Cross–Appellee Sunbeam Products, Inc. ("Sunbeam") and permanently enjoining Sunbeam from infringing U.S. Patent No. D348, 585 ("Patent"). Appellee–Cross–Appellant Wing Shing Products (BVI) Ltd. ("Wing Shing") opposes cross-appeals to reverse certain parts of the Bankruptcy Court decision, including the Bankruptcy Court's calculation of damages.[1] For the reasons stated herein, the Bankruptcy Court's memorandum decision is affirmed in part and reversed in part.

### FACTS

This litigation revolves around a design patent for a coffeemaker. The following facts are based on the record designated by the parties and the findings of the Bankruptcy Court after trial, see *In re AI Realty Marketing of N.Y., Inc.,* 293 B.R. 586 (Bankr.S.D.N.Y.2003).

In June 1991, John Sham, the president of Wing Shing, contacted Mr. Coffee, Inc. ("Mr. Coffee") to inquire whether Mr. Coffee might be interested in contracting with Wing Shing to manufacture coffeemakers.[2] (*See In re AI Realty Marketing of N.Y., Inc.,* 293 B.R. at 595 (hereinafter "Op."); D29.)[3] Sham stated that Wing Shing had been in business for 28 years and was now one of the largest Hong Kong manufacturers of household appliances. (*See* D29.)

---

1. The Bankruptcy Court issued two orders regarding the calculation of damages. The first order, a memorandum opinion, *In re AI Realty Marketing of N.Y., Inc.,* 293 B.R. 586 (Bankr.S.D.N.Y.2003), forms the original basis for this appeal, case numbers 03 Civ. 7190 and 03 Civ. 7923. The second order was a final judgment issued on March 11, 2004. The appeal from the second order, case number 04 Civ. 3347, has been consolidated with this matter by order of this Court dated May 18, 2004.

2. Mr. Coffee was later acquired by Sunbeam, the appellant-cross-appellee in the present matter.

3. References to Sunbeam's Designation of Record on Appeal are cited as "D"; references to Wing Shing's Counter–Designations of Record on Appeal are cited as "CD".

Sham provided Jeffrey Blackwell, then Vice President of Operations at Mr. Coffee, with sketches of a proposed coffeemaker design. (*See* Op. at 595.)

Mr. Coffee produced and marketed exclusively coffeemakers. (*See* D12, Ex. 10.) At the time Sham contacted Mr. Coffee, Mr. Coffee was interested in marketing a series of European-styled coffeemakers. (*See* D82 at 100:19–102:16.) European-styled coffeemakers had softer edges and were more circular, less angular than other coffeemakers. (*See* D82 at 102:7–102:16.)

Through a series of correspondences beginning in August 1991 and lasting through early 1992, Mr. Coffee suggested a number of changes to the coffeemaker design proposed by Wing Shing. (*See* Op. at 595–96; D34; D36; D39; D40; D44; D47; D49; D69.) The changes included (1) eliminating grooves on the brew basket so that the basket was smooth, (2) eliminating ridges on the reservoir cover so that the cover was smooth, (3) moving the power switch from the base of the coffeemaker to the left side, (4) making the brew basket open from left to right instead of right to left, (5) moving the water level gauge from the right side of the coffeemaker to the left side, (6) inserting a metal plate on the bottom of the coffeemaker, and (7) adding a shroud to the power switch. (*See* Op. at 595–96; D34; D35; D37; D38; D39.)

On November 8, 1991, while the parties were still discussing changes to the proposed coffeemaker design, Mr. Coffee provided Wing Shing with a draft supply agreement. (*See* Op. at 596; D12, Ex. 6.) The parties proceeded to negotiate the terms of the contract as the coffeemaker design was being finalized. (*See* Op. at 596.) Mr. Coffee agreed to allow Wing Shing to use certain Mr. Coffee patents for

coffeemakers Wing Shing manufactured for Mr. Coffee. (*See* D12, Ex. 10; D81 at 37:7–37:16.)

In early July 1992, Wing Shing and Mr. Coffee executed an agreement ("Agreement") by which Wing Shing would manufacture a coffeemaker to be sold by Mr. Coffee, namely the coffeemaker ("AD10") originally proposed by Wing Shing and incorporating certain changes suggested by Mr. Coffee. (*See* Op. at 596; D55.) The term of the Agreement began on January 7, 1992, and extended through December 31, 1994. (*See* Op. at 596; D55 (¶ 4).) The Agreement granted Mr. Coffee an exclusive license to sell the AD10 in North America. (*See* Op. at 596.) The Agreement stated that "[a]ny and all existing patent rights for the [coffeemaker] units or any of its component parts shall be the sole and exclusive property and/or responsibility of Mr. Coffee. In the event that Mr. Coffee and [Wing Shing] jointly develop a patentable item both parties agree to negotiate patent rights prior to applying for the patent." (*See* Op. at 596; D55 (¶ 16).) The Agreement also stated that the "tooling [for the coffeemaker], and drawings related thereto, is property of Mr. Coffee." (*See* Op. at 596; D55 (¶ 9).) The Agreement further stated that disputes regarding the Agreement would be "governed by the laws of the State of Ohio." (D55 (¶ 23(f)).)

Shortly after executing the Agreement and without informing Mr. Coffee, Sham filed a patent application for the AD10 design. (*See* Op. at 596; D70; D71; D81 at 37:2–37:6, 127:11–129:3.) Sham's application listed himself as the sole inventor.[4] (*See* Op. at 596; D71; D81 at 127:7–127:10.) The Patent issued in July 1994, though Wing Shing neither informed Mr. Coffee nor included notice of the Patent on

---

**4.** Sham assigned the Patent to Wing Shing on

June 10, 1996. (*See* Op. at 597.)

the AD10 or its packaging. (*See* Op. at 596; D70; D81 at 37:2–37:6.)

In November 1994, Mr. Coffee informed Wing Shing that Simatelex Manufactory Co., Ltd. ("Simatelex") would be manufacturing some AD10 coffeemakers for Mr. Coffee. (*See* Op. at 596; D58; D81 at 44:14–44:22.) Wing Shing did not object at that time. (*See* Op. at 596.) However, in a March 9, 1995, fax to Dan Kubis, then an employee of Mr. Coffee, Wing Shing stated that, although Mr. Coffee owned the tooling, "we [Wing Shing] have the product design patent of AD10 and was being filed. That means, we can sell and we will sell the same product to other customers in the same market. It will definitely create business conflicts between us." (*See* Op. at 596–97; D59.)

In January 1996, Sham attended a houseware show in Chicago, Illinois, and noticed that the AD10 on display at Mr. Coffee's booth had not been manufactured by Wing Shing. (*See* Op. at 597.) Sham claims that he discussed this with Kubis at the show. (*See* Op. at 597.)

Around the time of the houseware show, Kubis sent a letter to Wing Shing complaining about companies other than Sunbeam selling AD10 coffeemakers manufactured by Wing Shing. (*See* Op. at 597.) The letter indicated that Mr. Coffee was considering production of a different model coffeemaker, the AD12, and offered to allow Wing Shing to manufacture the AD12 as a "reward" should AD10 business decrease. (*See* Op. at 597.) Wing Shing responded that it would provide a price quote for manufacturing the AD12 and

that, at Mr. Coffee's request, Wing Shing would cease manufacturing the AD10 for other companies. (*See* Op. at 597.)

In the fall of 1998, Sunbeam, which had by then acquired Mr. Coffee, considered shifting manufacturing of the AD10 away from Wing Shing to Simatelex. (*See* Op. at 597; CD141 at 26:14–27:8.) In an email exchange on October 1, 1998, Sunbeam employee David Buck concluded that Wing Shing "owns the tooling and design [for the AD10], even though 4 or 5 years ago we [Mr. Coffee] made the decision to tool the same design at Simatelex. They [Wing Shing] either don't realize this fact . . . or have kept quiet about it because our business was increasing with them. It likely WILL be an issue if we part ways". (*See* Op. at 597; CD113.) Armed with this information, Sunbeam employee Paul Warfel stated, in another email exchange, that the design of the AD10 "may change slightly to avoid patent issues. TBD." [5] (*See* Op. at 597; CD114.)

In 2000, Mr. Coffee executed a formal supply agreement with Simatelex. (*See* CD120; CD121.) By the end of 2000, Sunbeam's volume of purchases from Wing Shing decreased by 50 percent. (*See* Op. at 597.)

On February 9, 2001, Wing Shing initiated a patent infringement action against Simatelex.[6] (*See* Op. at 597–98.) On February 23, 2001, Sunbeam commenced an Adversary Proceeding against Wing Shing in Bankruptcy Court. (*See* Op. at 598.) The Bankruptcy Court held a trial on this matter and issued its ruling on June 3, 2003.

---

**5.** Sunbeam claims that "TBD" stands for "to be determined". (*See* Sunbeam Br. at 17–18.) Sunbeam allegedly conducted a patent search relating to the AD10 in 1998; however, Sunbeam's search did not uncover any patents and outside counsel was never employed to carry out further searches. (*See* Op. at 597.)

The Bankruptcy Court noted that "Sunbeam has been unable to provide corroborating evidence that the search was conducted." (Op. at 597.)

**6.** That action is also before this Court and is presently stayed pending this decision.

The Bankruptcy Court ruled that Wing Shing was not equitably estopped from asserting an infringement claim against Sunbeam because Wing Shing did not mislead Sunbeam into thinking that Wing Shing would not enforce its patent. (*See* Op. at 599–600.) However, the Bankruptcy Court determined that Wing Shing failed to provide notice of the infringement and that the doctrine of laches applied, thereby limiting Wing Shing's damages to the period after suit against Simatelex was initiated. (*See* Op. at 603.)

With respect to the contractual issues in dispute, the Bankruptcy Court found that the parties' use of the term "existing patent rights" did not include the right to apply for a patent and, thus, the assignment of "[a]ny and all existing patent rights" to Mr. Coffee did not include the idea or unfiled application for the Patent. (*See* Op. at 607.) The Bankruptcy Court further found that, according to the terms of the contract, Sunbeam did not have an exclusive license to use the Patent such that Wing Shing's infringement claim was barred. (*See* Op. at 610.) The Bankruptcy Court did hold that, assuming that the Patent was jointly developed and that Wing Shing was contractually obligated to negotiate the rights for the Patent, Wing Shing breached this obligation by filing the patent application. (*See* Op. at 607–08.) However, the statute of limitations had run on Sunbeam's possible claim for this breach of contract. (*See* Op. at 608.)

Finally, the Bankruptcy Court ruled that Sunbeam was not a joint inventor of the Patent. (*See* Op. at 614.) The Bankruptcy Court concluded that Sunbeam's contributions to the Patent were all either well-known concepts in the design of coffeemakers or functional changes. (*See id.*) The Bankruptcy Court also concluded that, even if the changes were all ornamental, the contribution to the overall appearance was not significant enough to achieve co-inventor status. (*See id.*)

Turning to the issue of damages, the Court reasoned that, since Sunbeam could have designed around the Patent at a cost of between $32,000 and $173,000, a reasonable royalty would have to fall in between those two sums. (*See* Op. at 617.) The Bankruptcy Court also reasoned that a prime rate of interest should apply to the damages. (*See id.*) The Bankruptcy Court declined to award treble damages or attorneys fees to Wing Shing; however, the Bankruptcy Court reasoned that damages in an amount equal to Sunbeam's profits from the sale of infringing coffeemakers produced by Simatelex could be applicable. (*See* Op. at 618–19.) The Bankruptcy Court ultimately decided that Wing Shing should be awarded the greater of its lost royalties or Sunbeam's total profits and directed the parties to submit further evidence to determine the exact damages. (*See* Op. at 620.) On March 11, 2004, the Bankruptcy Court issued a final judgment against Sunbeam in the amount of $2,304,403. (*See* D96.)

Both Sunbeam and Wing Shing have appealed from the Bankruptcy Court ruling and final judgment. Sunbeam seeks review of the following issues: (i) whether the Bankruptcy Court erred in finding that Mr. Coffee employees are not co-inventors of the Patent; (ii) whether the Bankruptcy Court erred in finding that Wing Shing's infringement claim is not barred by the doctrine of equitable estoppel; (iii) whether the Bankruptcy Court erred in interpreting the terms of the Agreement; and (iv) whether the Bankruptcy Court erred in not finding that the Patent is unenforceable due to inequitable conduct. (*See* Sunbeam Br. at 4.) Wing Shing, for its part, seeks review of the following issues: (i) whether the Bankruptcy Court erred in holding that Wing Shing failed to provide

notice of infringement and that the doctrine of laches applied to Wing Shing's claim; and (ii) whether the Bankruptcy Court erred in calculating damages. (*See* Wing Shing Br. at 1–2.)

## DISCUSSION

■ A district court reviews the findings of fact of a bankruptcy court under a "clearly erroneous" standard, while conclusions of law are reviewed *de novo*. *See In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988 (2d Cir.1990). When there are mixed questions of law and fact, district courts should review legal conclusions *de novo* while giving deference to the bankruptcy court's factual determinations unless they are clearly erroneous. *See Underwriters at Lloyd's of London v. 150 Nassau St. Billiards, Inc.*, No. 03 Civ. 1420, 2003 WL 22999464, at *4 (S.D.N.Y. Dec. 22, 2003).

### I. Joint Inventorship of the Patent

The first issue for the Court is whether Sunbeam is a joint inventor of the Patent. The Bankruptcy Court concluded that Sunbeam is not a joint inventor. (*See* Op. at 614.) Sunbeam argues that the Bankruptcy Court committed four errors in arriving at that conclusion. First, Sunbeam argues that the Bankruptcy Court should have found Sunbeam to be a joint inventor because Wing Shing did not seek to exclude from the Patent the alterations suggested by Mr. Coffee. (*See* Br. of Appellant Sunbeam at 20–21 (hereinafter "Sunbeam Br.").) Second, Sunbeam argues that the Bankruptcy Court did not apply the proper test for evaluating Mr. Coffee's contributions, that the Bankruptcy Court should have determined whether the overall appearance of the design was dictated by functional considerations. (*See id.* at 21–24.) Third, Sunbeam argues that the Bankruptcy Court should have found that Mr. Coffee's suggested

elimination of ridges and grooves, which were undisputedly ornamental, made Sunbeam a co-inventor. (*See id.* at 24–25.) Fourth, Sunbeam argues that the changes to the power switch, brew basket, water level gauge, and coffeemaker bottom should not have been deemed functional changes. (*See id.* at 26–30.)

■ The Court begins by addressing Sunbeam's second argument—the test for evaluating Mr. Coffee's contributions—because resolution of that argument is in fact dispositive as to all four arguments. Design patents may be obtained by "[w]hoever invents any new, original and ornamental design for an article of manufacture." 35 U.S.C. § 171 (1994). An inventor under the patent laws is the person or persons who conceived the patented invention, and their legal status as inventor does not change simply because the inventor uses the services, ideas, and aid of others in the process of perfecting their invention. *See Hoop v. Hoop*, 279 F.3d 1004, 1007 (Fed. Cir.2002). "One may not qualify as a joint inventor . . . by merely assisting the actual inventor *after conception* of the claimed invention." *Id.* (emphasis in original) (quotations omitted).

It is undisputed that Wing Shing originated a coffeemaker design and that this design eventually became the basis for the Patent. The question is whether Sunbeam's input along the way—the changes from the original proposal to the final patented design—caused enough of an alteration from the original design to raise Sunbeam to the level of co-inventor.

■ To qualify as a joint inventor, the differences between the original design and the improved design must be significant—the improved design must contain an inventive concept. *See id.* "The ultimate test for design-patent inventorship, like the test for anticipation and infringement, is whether the [improved] in-

vention is 'substantially similar' to the [original]." *Id.* This essentially means that, if the improved design could not be found to infringe the original design, the person responsible for the alterations is a joint inventor because their improvements were significant.

■ However, "[a] design patent only protects the novel, ornamental features of the patented design." *OddzOn,* 122 F.3d at 1405. Thus, "[w]here a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent."[7] *Id.* Then, to evaluate inventorship (or infringement), the original claimed design, as a whole—as encompassed by the ornamental features but not the functional features—is compared against the improved or allegedly infringing design, also as a whole. *See Contessa Food Prods., Inc. v. Conagra, Inc.,* 282 F.3d 1370, 1378 (Fed.Cir.2002) ("Our precedent makes clear that all of the ornamental features illustrated in the figures must be considered in evaluating design patent infringement"); *Unidynamics Corp. v. Automatic Prods. Int'l, Ltd.,* 157 F.3d 1311, 1323 (Fed.Cir.1998) ("In determining this overall similarity of design, the ordinary observer must be deceived by the features common to the claimed and accused designs that are ornamental, not functional"); *see, e.g., OddzOn,* 122 F.3d at 1405 ("We agree with the district court's claim construction, which properly limits the scope of the patent to its overall ornamental visual impression, rather than to the broader general design concept").

■ The Bankruptcy Court's decision regarding joint inventorship contains mixed questions of law and fact. A determination of inventorship, as a general matter, is a question of law to be reviewed *de novo. See Sewall v. Walters,* 21 F.3d 411, 415 (Fed.Cir.1994). Yet, whether the improved design, as a whole, is substantially similar to the original, as a whole, is a question of fact, *see Hoop,* 279 F.3d at 1007 (citing *L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1124 (Fed.Cir. 1993)); *cf. OddzOn Prods., Inc. v. Just Toys, Inc.,* 122 F.3d 1396, 1405 (Fed.Cir. 1997) ("The comparison step of the infringement analysis requires the fact-finder to determine whether the patented design as a whole is substantially similar in appearance to the accused design"), and will be reviewed for clear error.

■ The Bankruptcy Court found that, considering "the overall appearance of the Design Patent, ... Mr. Coffee's contribution to the Design Patent was not significant enough in quality when measured against the dimension of the full invention so as to achieve co-inventor status." (Op. at 613.) Sunbeam argues that this finding "misses the point" because, before considering the overall appearance of the design, the Bankruptcy Court examined the various changes individually and made findings as to whether each change was functional or ornamental. (*See* Sunbeam Br. at 24.) Sunbeam also argues that "[t]here can be no doubt that Mr. Coffee is a co-inventor" because Wing Shing's own witnesses testified that Sunbeam's contributions "changed the look and overall appearance of the coffeemaker." (*Id.* at 22–24.)

7. The fact that there may be "other ways to achieve the function provided by the feature" (Sunbeam Br. at 26) is not dispositive as to whether a feature is functional or ornamental. *See Berry Sterling Corp. v. Pescor Plastics, Inc.,* 122 F.3d 1452, 1456 (Fed.Cir.1997). For ex- ample, a court may also consider if the feature was the best way to achieve the function, *see id.,* thus making the feature functional even though there might be other ways to achieve that function.

This Court disagrees. The Bankruptcy Court's eventual finding that the patented design was substantially similar to the original is not compromised by the Bankruptcy Court's initial consideration of the changes individually. Whatever the initial findings, the Bankruptcy Court ultimately applied the correct test. The Bankruptcy Court evaluated the original design against the patented design—while assuming all the changes were ornamental—and decided, as the fact-finder, that the two designs appeared substantially similar. This conclusion is not erroneous simply because there is testimony to support a contrary position. The Bankruptcy Court, as fact-finder, was in a position to view the two designs, evaluate the testimony, and make its own determination as to substantial similarity. Reviewing the two designs, this Court does not conclude that the Bankruptcy Court's finding was clear error.[8] Thus, the Court affirms the Bankruptcy Court's conclusion that Sunbeam is not a joint inventor of the Patent.[9]

## II. Contractual Issues

### A. Assignment of Existing Patent Rights

■ Having determined that Sunbeam is not a joint inventor of the Patent, the Court turns to examine whether Sunbeam can claim ownership of the Patent according to the terms of the Agreement. Applying Ohio law, the Bankruptcy Court ruled that "[t]he Agreement is clear and unambiguous on its face" and it "does not provide for an assignment of the Design Patent to Sunbeam."[10] (Op. at 604.) Noting that the Agreement calls for "[a]ny and all existing patent rights for the units [to] be the sole and exclusive property . . . of Mr. Coffee" (D55 (¶ 16)), the Bankruptcy Court reasoned that the ordinary meaning of the term "existing patent rights" does not include the right to apply for a patent in the future. See Op. at 605 (citing *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 777 (Fed.Cir.1995).) The Bankruptcy Court reasoned that the Agreement, read in its entirety, indicates that the parties intended that term to exclude the right to apply for a patent in the future. (*See* Op. at 605–607.)

Citing *Burroughs Wellcome Co. v. Barr Labs. Inc.*, 40 F.3d 1223 (Fed.Cir.1994), Sunbeam argues that the term "existing patent rights" does include the right to apply for a patent in the future and that this right attaches at the moment an invention is conceived. (*See* Sunbeam Br. at 37.) As the design for the AD10 was completed by the spring of 1992, Mr. Coffee's patent rights came into existence then—before the effective date of the Agreement, June 22, 1992.[11] (*See id.* at

---

8. Thus, Sunbeam is not a joint inventor even if, as Sunbeam argues, (a) all the suggestions were ornamental and (b) Wing Shing did not seek to exclude the changes from the Patent. Furthermore, though not necessary for its holding, the Court notes that whether a feature is functional or ornamental is a question of fact. *See Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1460 (Fed.Cir.1997). The Court does not find that the Bankruptcy Court committed clear error in concluding that the changes to the power switch, brew basket, water level gauge, and coffeemaker bottom were functional, rather than ornamental, even though there might have been other ways to achieve those functions. *See, e.g., Berry Sterling*, 122 F.3d at 1456.

9. Since the Court declines to hold that Sunbeam is a joint inventor of the Patent, Sunbeam's argument that it is immune from patent infringement claims as a co-inventor, and thus co-owner of the Patent (Sunbeam Br. at 30–31), is rendered moot.

10. Sunbeam does not dispute the propriety of the application of Ohio law.

11. Sunbeam also argues that "existing patent rights" should be determined from July 13,

38.) Thus, argues Sunbeam, Mr. Coffee is the exclusive owner of the Patent under the Agreement. (*See id.* at 38.)

 When contract terms are unambiguous, contract interpretation is a matter of law to be reviewed *de novo* on appeal to district court. *See In re Chateaugay Corp.*, 156 B.R. 391, 404 (S.D.N.Y. 1993); *accord Jessica Howard Ltd. v. Norfolk Southern R.R. Co.*, 316 F.3d 165, 168 (2d Cir.2003). Under Ohio law, a court must interpret a contract so as to carry out the intent of the parties. *See Wauseon Plaza Ltd. v. Wauseon Hardware Co.*, 807 N.E.2d 953, 957, 156 Ohio App.3d 575, 582 (2004). The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement. *See id.* at 958, 156 Ohio App.3d at 582, 807 N.E.2d 953. Courts have an obligation to give plain language its ordinary meaning and to refrain from revising the parties' contract. *See id.*

The Court finds that Sunbeam was not assigned ownership rights to the Patent. While *Burroughs Wellcome* shows that "patent rights" *could* include the right to apply for future patents, this Court cannot conclude that such meaning is the ordinary meaning of the term as intended by the parties. The fact that Sunbeam has adopted a conflicting interpretation of the Agreement does not create ambiguity, or a basis for unreasonable interpretation of the language or the original intent of the parties, where no such ambiguity should reasonably be found. *See Ohio Water Dev. Auth. v. W. Reserve Water Dist.*, 776 N.E.2d 530, 535, 149 Ohio App.3d 155, 161 (2002). The Court agrees with the Bankruptcy Court's reasoning on this point:

"At the very least, the proposition that the assignment of all 'existing patent rights' captures the assignment of a mere idea or unfiled patent application is unsupported, absent some specific indication in the Agreement that such an assignment was intended. ... On its face, the Agreement calls for the assignment of patents and possibly patent applications, but it does not explicitly assign rights to future patents or patent applications." (Op. at 605, 606.)

Sunbeam's argument calls for a strained reading of the Agreement, which was written by two sophisticated companies not unfamiliar with contracts or patents. Reviewing the Agreement in its entirety, the only way to give ordinary meaning to the word "existing" is to exclude rights to apply for possible patents in the future. Such rights are inchoate in plain language, rather than existing. The "existing patent rights" sentence (D55 (¶ 16)) is meant to protect Mr. Coffee from surrendering patent rights that are actual and established—important protection considering that Mr. Coffee agreed to allow Wing Shing to use some of Mr. Coffee's existing patents in manufacturing the AD10. (*See* D12, Ex. 10; D81 at 37:7–37:16 (discussing Mr. Coffee's permission to use the "Pause and Serve" patent).) Indeed, it is the next sentence of the Agreement that contemplates future patents: "In the event that Mr. Coffee and Wing Shing jointly develop a patentable item ...." (D55 (¶ 16).) Thus, the Court concludes that the ordinary meaning of "existing patent rights"— the meaning that the parties intended— does not include rights to apply for possible patents in the future, which rights are explicitly addressed in a separate sentence within the same paragraph of the Agree-

1992, not from the June 22 effective date, because the Agreement was fully executed on

July 13.

ment.[12]

## B. Obligation to Negotiate

That conclusion brings the Court to the Agreement's next sentence, which addresses possible patents issued after the term of the Agreement began. That sentence states that, "[i]n the event that Mr. Coffee and [Wing Shing] jointly develop a patentable item both parties agree to negotiate patent rights prior to applying for the patent." (D55 (¶ 16).) The Bankruptcy Court found that Wing Shing was not in violation of that agreement because (a) the statute of limitations on any claim that Wing Shing had to negotiate patent rights on the Patent expired prior to the filing of the Bankruptcy Court proceeding and (b) Mr. Coffee is not a co-inventor of the Patent, thus defeating Sunbeam's claim that the Patent was "jointly developed" by Mr. Coffee and Wing Shing. (See Op. at 607.)

Sunbeam argues that the Bankruptcy Court incorrectly found that the statute of limitations for asserting a breach began to run when Wing Shing filed the patent application rather than when Wing Shing allegedly refused to negotiate rights to the Patent. (See Sunbeam Br. at 38–39.) Sunbeam argues that refusal occurred, at earliest, when Wing Shing sent the March 9, 1995, fax stating that Wing Shing had a design patent. (See id. at 39.) Sunbeam also argues that Wing Shing should be estopped from availing itself of the statute of limitations defense because Wing Shing's alleged misrepresentations caused Mr. Coffee not to bring suit. (See id.)

As resolution of these arguments involves interpretation of the Agreement, the Court reviews the Bankruptcy Court decision on this issue de novo. See In re Chateaugay Corp., 156 B.R. at 404; accord Jessica Howard Ltd., 316 F.3d at 168. Again, the Court must give the Agreement's plain language its ordinary meaning as intended by the parties. See Wauseon Plaza, 807 N.E.2d at 957–58, 156 Ohio App.3d at 582.

■ As a preliminary matter, the Court notes that its earlier conclusion that Mr. Coffee is not a joint inventor of the Patent does not preclude a finding that Mr. Coffee "jointly developed" the Patent with Wing Shing. Whether a party has patent rights as a co-inventor is a distinct issue from whether a party who is not a co-inventor has acquired a right to share patent rights through an agreement with the inventor. "Joint inventor" is a legal term of art not necessarily equivalent to "joint developer," as understood in plain language. A party that makes contributions to an invention could be considered a joint developer though the contributions do not rise to the level of making that party a joint inventor. Had Mr. Coffee and Wing Shing intended to limit the obligation "to negotiate patent rights" to situations

---

12. Even assuming "existing patent rights" included the right to apply for future patents, that right as it pertains to the Patent would not have existed at the time from which the parties agreed to be bound. "[W]here where the parties themselves agree that a contract between them should be given effect as of a specified date, ... there is no sound reason why that agreement should not be given effect." 2 Richard A. Lord, Williston on Contracts § 6:60 (4th ed. West 2004). Since the parties agreed to be bound by the Agreement starting January 7, 1992, see D55 (¶ 4) (The term of this Agreement (the "Term") shall begin on January 7, 1992 and shall extend through December 31, 1994), it is from that date that "existing patent rights" would be considered. As the design for the AD10 was completed by the spring of 1992, see Sunbeam Br. at 38, Mr. Coffee's rights to the Patent would have come into existence after the term of the Agreement began on January 7, 1992. Thus, even Sunbeam's strained interpretation of the Agreement would not provide Sunbeam ownership rights.

where both were "joint inventors," they could have drafted the contract accordingly. Since the Agreement does not limit the obligation in that way, the Court must consider whether Mr. Coffee, though not a joint inventor, jointly developed the Patent.

■ From 1991, when Wing Shing first gave sketches of a coffeemaker design to Mr. Coffee, through spring of 1992, when the AD10 design was completed, the parties refined the AD10 design. There is no dispute that Mr. Coffee made contributions to the development of the AD10 during this time. As discussed above, the Agreement protects Mr. Coffee's rights to existing patents it owned before January 7, 1992, that were applied to the AD10. The "jointly developed" sentence is meant to cover possible patents for the AD10 that did not exist before January 7, 1992 (the date on which the contract term began), and that were developed thereafter as the parties perfected the AD10. The Patent fits squarely within that coverage. The Court finds that Mr. Coffee did jointly develop the Patent with Wing Shing, placing upon Wing Shing the obligation "to negotiate patent rights prior to applying for the patent." (D55 (¶ 16).) Thus, the Court reverses the Bankruptcy Court decision to the extent it holds that, since "Sunbeam was not a joint inventor of the Design Patent, Wing Shing did not have an obligation to negotiate the rights to such Design Patent." (Op. at 608.)

■ However, the Court agrees with the Bankruptcy Court's alternate conclusion that the statute of limitations on any obligation that Wing Shing had to negotiate rights to the Patent started to run on July 13, 1992, *see id.*, the later of the filing of the application by Sham (July 13, 1992) or the effective date of the Agreement (June 22, 1992), thereby barring Sunbeam's recovery for a breach of contract claim.

■ Breach of contract claims are governed by a six-year statute of limitations. *See* N.Y. C.P.L.R. § 213 (McKinney's 2003). A cause of action for breach of contract accrues and the statute of limitations begins to run when the contract is breached. *See Lamendola v. Mossa,* 736 N.Y.S.2d 836, 837–38, 190 Misc.2d 147, 149 (N.Y.App.Term.2001). Knowledge of the breach is not necessary to start the statute of limitations running. *See id.*

The Agreement clearly states that a party must negotiate patent rights *before* filing a patent application. Wing Shing filed the patent application without negotiating with Mr. Coffee. Therein lies the breach. Sunbeam's argument that the breach occurred in 1995 when Wing Shing allegedly refused to negotiate is untenable. In order to find that the breach occurred in 1995, the Court would have to posit that, had Wing Shing negotiated patent rights with Mr. Coffee in 1995, Wing Shing would not have been in breach of its contractual obligation. Yet, negotiation in 1995—almost three years after the application was filed—would not cure Wing Shing's failure to negotiate *before* filing the patent application. In a scenario where negotiations occurred in 1995, Sunbeam would still have a cause of action for breach of contract, which arose on July 13, 1992, when the application was filed.[13]

---

13. *Frigi–Griffin, Inc. v. Leeds,* 52 A.D.2d 805, 383 N.Y.S.2d 339 (N.Y.App.Div.1976), is inapposite. In that case, the court found that "[t]he cause of action against [defendant] did not accrue when [defendant] filed his patent application in 1968, since that filing was not wrongful." *Id.* at 806, 383 N.Y.S.2d at 341. In the instant case, Sham's filing was in fact wrongful since, in violation of the Agreement, no negotiation had yet taken place.

Given that the breach occurred on July 13, 1992, Sunbeam had until July 13, 1998, to bring a breach of contract claim against Wing Shing for filing the patent application in violation of the Agreement. Sunbeam initiated this action in February 2001, by which time the statute of limitations had run. Sunbeam is thus barred from asserting a breach of contract claim.

 The Court declines to hold that Wing Shing is estopped from asserting a statute of limitations defense. "It is the rule that a defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli,* 44 N.Y.2d 442, 449–50, 406 N.Y.S.2d 259, 377 N.E.2d 713, 716 (N.Y.1978); *see, e.g., Eagle Comtronics, Inc. v. Pico Prods., Inc.,* 256 A.D.2d 1202, 1203–04, 682 N.Y.S.2d 505, 507 (N.Y.App.Div.1998) (citing *Simcuski v. Saeli*). However, "[i]f the conduct relied on (fraud, misrepresentation or other deception) has ceased to be operational within the otherwise applicable period of limitations (or perhaps within a reasonable time prior to the expiration of such period), many courts have denied application of the doctrine on the ground that the period during which the plaintiff was justifiably lulled into inactivity had expired prior to the termination of the statutory period, and that the plaintiff had thereafter had sufficient time to commence his action prior to the expiration of the period of limitations." *Simcuski,* 44 N.Y.2d at 450–51, 406 N.Y.S.2d 259, 377 N.E.2d at 717.

According to Sunbeam's own argument, Mr. Coffee learned about the breach, at latest, when Mr. Coffee received Wing Shing's March 1995 fax, in which "Wing Shing refused to negotiate rights to the [Patent]." (Sunbeam Br. at 39.) At that time, Mr. Coffee had over three years remaining before the statute of limitations

foreclosed a breach of contract claim. Yet, Mr. Coffee appears to have made a calculated decision not to enforce its claim during that time. Indeed, it is not certain that Sunbeam would have ever brought a breach of contract claim against Wing Shing had Wing Shing not initiated an infringement action against Simatelex first. For these reasons, the Court holds that, although Wing Shing breached the Agreement, Sunbeam's claim for breach of contract is barred by the statute of limitations and Wing Shing is not estopped from asserting a statute of limitations defense.

## C. Exclusive License

 A separate issue under the Agreement is whether Sunbeam has a permanent exclusive license to market and sell the AD10 such that Sunbeam implicitly has a license to use the Patent. The Bankruptcy Court ruled "that the Agreement does not ... grant Sunbeam a permanent license for the Design Patent." (Op. at 604.) The Bankruptcy Court reasoned that, while an exhibit to the Agreement uses the term "indefinite exclusive rights," the plain language of the actual Agreement, which itself was for a finite period, does not grant Mr. Coffee a license for time eternal. (*See* Op. at 608–10.) The Bankruptcy Court explained that "it is the exclusivity clause found in the Agreement, not in the Specification Exhibit, that is binding on the parties." (Op. at 609.)

Sunbeam argues that the Bankruptcy Court erred in concluding that Sunbeam was not a permanent exclusive licensee of the Patent. (*See* Sunbeam Br. at 37–38.) Sunbeam argues that there is testimonial evidence to support a determination that the design "was [forever] exclusive to Mr. Coffee even after the stated expiration of the Agreement." (Sunbeam Br. at 37–38.)

The Court reviews this issue of *contract* interpretation *de novo, see In re Chateau-*

*gay Corp.*, 156 B.R. at 404; *accord Jessica Howard Ltd.*, 316 F.3d at 168, giving controlling effect to the ordinary meaning of the plain language of the contract. *See Wauseon Plaza*, 807 N.E.2d at 957–58, 156 Ohio App.3d at 582. As stated earlier, a conflicting interpretation of the contract does not create ambiguity or a basis for unreasonable interpretation of the language, or the original intent of the parties, where no such ambiguity should reasonably be found. *See Ohio Water Dev. Auth.*, 776 N.E.2d at 535, 149 Ohio App.3d at 161.

The Court agrees with the Bankruptcy Court's reasoning here:

> "According to this language of the Agreement, the Specification Exhibit is incorporated into the Agreement for the sole purpose of providing the specifications of the AD Coffeemakers. The summary of the terms provided in the Specification Exhibit does not govern the relationship between the parties, and it does not override the terms set forth in the body of the Agreement." (Op. at 609.)

Sunbeam's argument on the exclusive license issue calls for the Court to ignore the plain language of the Agreement, Despite the language in the exhibit and the testimony that Sunbeam references to explain the meaning of that language in the exhibit, the plain language of the Agreement does not support a determination that the parties intended for the Agreement to grant Mr. Coffee a perpetual exclusive license for the AD10. Moreover, there is testimonial evidence indicating that Mr. Coffee did not understand the Agreement to grant Mr. Coffee a perpetual exclusive license for the AD10.[14] (*See* Op. at 610 (citing Blackwell deposition).) In any event, the plain language of the contract prevails over any disputed parole evidence. Thus, the Court finds that the Agreement neither provides for Sunbeam to have an exclusive permanent license to market and sell the AD10 nor for Sunbeam to have a license to use the Patent in perpetuity.

### III. Equitable Issues

▆▆▆▆ Having determined that Sunbeam does not have rights to the Patent as a joint inventor or as a perpetual licensee pursuant to the Agreement, the Court now considers whether Sunbeam has defenses for alleged infringement under principles of equity, namely the doctrines of equitable estoppel, implied license, and unenforceability. Being equitable doctrines, these defenses are committed to the sound discretion of the trial judge and are reviewed under the abuse of discretion standard. *See ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1063 (Fed.Cir.1995).

#### A. Equitable Estoppel

▆▆▆▆ The Court first considers whether the Bankruptcy Court erred in concluding that, because Wing Shing did not engage in conduct that misled Sunbeam into believing it was free to use the Patent, Wing Shing was not equitably estopped from asserting an infringement claim. (*See* Op. at 599–600.) The Bankruptcy Court based its conclusion on the March 9, 1995, fax sent by Wing Shing that "informed Sunbeam that 'the important point is that

---

14. This, of course, makes sense because Mr. Coffee did not expect to need a license in perpetuity at the time the Agreement was drafted and executed. At that time, Mr. Coffee had no idea that Wing Shing would have a design patent that might hinder Mr. Coffee's sale of the AD10 coffeemakers. However, the Court cannot re-write or interpret the Agreement to take into account events that were not expected at the time and thus not provided for in the Agreement.

[Wing Shing] ha[s] the product design patent of the AD10 and ... we can sell and we will sell the same product to other customers in the same market.'" (*Id.* at 599.) The Bankruptcy Court reasoned that, through that fax, "Sunbeam was aware of the existence of the Design Patent and of the possibility that Wing Shing might try to use the Design Patent as leverage in its dealings with Sunbeam." (*Id.*) The Bankruptcy Court also reasoned that, since several of Sunbeam's internal emails from 1998 revealed that Sunbeam believed Wing Shing would enforce its patent rights, Sunbeam was not mislead by Wing Shing's conduct. (*See id.*)

Sunbeam argues that the Bankruptcy Court erred in failing to consider alleged instances where Wing Shing was silent when it should have threatened patent enforcement or should have stated its intention to file a patent application. (*See* Sunbeam Br. at 32–34.) Sunbeam also argues that the Bankruptcy Court's examination of the 1998 internal emails was erroneous because the emails might be relevant to evaluating whether Sunbeam relied on Wing Shing's conduct, but not to determining whether Wing Shing engaged in misleading conduct. (*See id.* at 34–35.) Sunbeam goes on to argue that Wing Shing did engage in misleading conduct when all the evidence is properly considered, that Sunbeam actually relied on Wing Shing's conduct, and that Sunbeam has been materially prejudiced due to this reliance. (*See id.* at 34–37.)

■ A claim for equitable estoppel requires three elements: (1) that the patentee, through misleading conduct, lulled the alleged infringer to reasonably infer that the patentee would not enforce its patent rights against the alleged infringer, (2) that the alleged infringer relied on this conduct, and (3) due to the reliance, the alleged infringer will be materially preju-

diced if the patentee is allowed to proceed with its claim. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed.Cir.1992).

The Court declines to hold that the Bankruptcy Court abused its discretion by allegedly failing to consider instances where Wing Shing was silent. Admittedly, some of Wing Shing's conduct could plausibly be considered misleading or at least of a type that sent mixed signals as to whether Wing Shing would enforce its patent rights. However, the Bankruptcy Court, having held a trial on this matter, concluded that the weight of the evidence supported a finding that Wing Shing did not engage in conduct sufficiently misleading for Sunbeam to reasonably infer that Wing Shing would not enforce its patent rights. There is sufficient evidence to support this conclusion, including the March 1995 fax, and this Court does not see cause to disturb the Bankruptcy Court's decision on that basis.

■ With respect to the Bankruptcy Court's examination of the 1998 emails, Sunbeam is correct in arguing that the focus of the first element of estoppel should be on the patentee's conduct, not on the alleged infringer's beliefs, which are more properly the focus of the second element of estoppel. *See ABB Robotics, Inc.*, 52 F.3d at 1064; *Engineered Prods. Co. v. Donaldson Co.*, 165 F.Supp.2d 836, 850 (N.D.Iowa 2001) (citing *ABB Robotics*). However, reversal on this ground would unduly elevate form over substance. It is clear from the opinion that the Bankruptcy Court found that Wing Shing's conduct, including the March 1995 fax from Wing Shing to Mr. Coffee, was not misleading and, more specifically, that Sunbeam did not rely on and was not misled by any such conduct. (*See* Op. at 599–600.) Reviewing the record, the Court does not find that either of these findings

is clearly erroneous.[15] The Bankruptcy Court might have been more precise in articulating its reasoning had it not discussed both of these findings under the umbrella of the first element rather than separately under the first and second elements. However, either of these findings would support the Bankruptcy Court's conclusion that the "defense [of equitable estoppel] should not bar Wing Shing's claims of patent infringement." (Op. at 600.) Thus, the Court declines to hold that the Bankruptcy Court abused its discretion in not finding equitable estoppel.

### B. Implied License

Sunbeam also argues that Mr. Coffee has an implied license to manufacture and sell the AD10 coffeemakers. (*See* Sunbeam Br. at 39–40.) Wing Shing, in opposition, argues that this issue was never raised with the Bankruptcy Court and, thus, it should not be considered now on appeal. (*See* Br. of Wing Shing Prods. (BVI) Ltd. at 24 (hereinafter "WS Br.").) Sunbeam replies that the Court has discretion to adjudicate this issue in order to avoid manifest injustice and that the issue can be adjudicated without additional fact-finding since the elements of implied license are similar to equitable estoppel.[16]

(*See* Reply Br. of Appellant Sunbeam Prods., Inc. at 16–17 (hereinafter "Sunbeam Reply").)

In general, appellate courts do not consider issues that were not raised before the trial court. *See Baker v. Dorfman*, 239 F.3d 415, 420 (2d Cir.2000). However, this general rule is not an absolute bar, but rather a rule of prudence. An appellate court has discretion to consider issues raised for the first time on appeal and is apt to do so if necessary to avoid manifest injustice. *See id.*

However, the Court declines to consider whether Sunbeam has an implied license because the Court is not convinced that a manifest injustice needs to be corrected here. Though the Bankruptcy Court engaged in thorough fact-finding, interpretation of those facts is largely in the eye of the beholder. Sunbeam would like the Court to accept that Mr. Coffee was unfairly duped by the Wing Shing—that Wing Shing filed a patent behind the back of Mr. Coffee as Mr. Coffee was dealing honestly with Wing Shing and that Wing Shing later used the product of that deceitful tactic to restrict Mr. Coffee. Yet, Mr. Coffee is a sophisticated corporation, not a stranger to patents, to contracts, to

---

15. The fact that the Bankruptcy Court also found that "Wing Shing did not want to charge Mr. Coffee with infringement" does not "lead[ ] to the inevitable conclusion that the first element of estoppel has been established." (Sunbeam Br. at 35.) Being reluctant to antagonize a business relation does not equate to misleading the business relation into believing that no action will be taken if a situation persists. The scope of estoppel would be greatly expanded if reluctance to antagonize a business relation inevitably satisfied the first element. Indeed, reluctant as Wing Shing might have been, it still found the gumption to send Mr. Coffee the March 1995 fax regarding the Patent and possible future problems between the two firms.

16. A claim for implied license has three elements: (1) the patentee, through statements or conduct, gave an affirmative grant of consent or permission to the alleged infringer to make, use, or sell a product or process covered by a patent; (2) the alleged infringer relied on that statement or conduct; and (3) the alleged infringer would, therefore, be materially prejudiced if the patentee is allowed to proceed with its claim. *See Winbond Elecs. Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363, 1374 (Fed.Cir.2001). These elements are similar to the elements of a claim for equitable estoppel. *Compare id.* (implied license) *with A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed.Cir.1992) (equitable estoppel).

selling coffeemakers, or to dealing with manufacturers. Given these facts, one could view Mr. Coffee's actions as deliberately turning a blind-eye to interactions with Wing Shing that should have raised red flags and placating Wing Shing when business was good, only to find itself in a precarious situation when business turned sour. This Court is not in a position to determine which of these contrasting interpretations is closer to the truth. For these reasons, the Court declines to consider Sunbeam's argument, raised for the first time on appeal.[17]

### C. Unenforceability

Finally, Sunbeam argues that the "Bankruptcy Court erred in failing to consider Sunbeam's evidence that the [Patent] is unenforceable due to inequitable conduct." (Sunbeam Br. at 40.) As evidence of inequitable conduct, Sunbeam argues that Wing Shing did not disclose to the U.S. Patent and Trademark Office ("PTO") (1) contributions to the claimed design made by Mr. Coffee and (2) prior art coffeemakers that Sham learned of from Mr. Coffee. (See id. at 41.) Wing Shing counters that Sunbeam did not raise this issue with the Bankruptcy Court. (See WS Br. at 27.) Sunbeam replies that it did raise this issue, albeit by arguing these points in a post-trial reply brief to the Bankruptcy Court. (See Sunbeam Reply at 17; D21 at 14–17.)

[30, 31] As a general matter, courts do not consider arguments raised for the first time in reply submissions. See, e.g., Evangelista v. Ashcroft, 359 F.3d 145, 156 n. 4 (2d Cir.2004). Thus, the Bankruptcy Court was within its discretion to not consider whether the Patent was unenforcea-

ble due to inequitable conduct, and this Court finds no error in the Bankruptcy Court's decision.

■■■■■ Alternatively, the Court notes that Sunbeam's argument would fail on the merits if it were considered. To hold a patent unenforceable for inequitable conduct, a court must find, by clear and convincing evidence, that the applicant omitted or misrepresented material facts with the intention of misleading or deceiving the patent examiner. See Monsanto Co. v. Bayer Bioscience N.V., 363 F.3d 1235 (Fed.Cir.2004). Once the challenger has shown the requisite levels of materiality and intent, the court must balance the equities to determine whether the patentee has committed inequitable conduct that warrants holding the patent unenforceable. See id.

Since the Bankruptcy Court determined (and this Court affirmed) that Mr. Coffee was not a joint inventor of the Patent, Sunbeam's first point could not be the basis for finding inequitable conduct sufficient to deem the Patent unenforceable. Cf. PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1321 (Fed.Cir.2000) ("[I]nventorship is material").

■■■■ As to Sunbeam's second point, Sunbeam has simply failed to highlight facts in the record below from which a court could infer that Wing Shing intended to mislead the PTO about prior art learned of from Mr. Coffee, thereby rendering the Patent unenforceable. The sum total of Sunbeam's argument here, which is the same argument that Sunbeam made in its post-trial reply submission to the Bankruptcy Court, is that Sham knew of alleged

---

17. The Court also notes that, were the Court to consider this defense, Sunbeam would likely stumble on the same hurdles that tripped up its equitable estoppel defense. Specifical-

ly, the evidence appears to indicate that Wing Shing did not affirmatively grant consent through conduct and Mr. Coffee did not believe Wing Shing to have consented.

prior art and did not disclose it to the PTO. (*See* Sunbeam Br. at 42; Sunbeam Reply at 17–18; D21 at 16–17.) However, intent to deceive cannot be inferred solely from the fact that information was known to the patentee and not disclosed to the PTO; there must be a factual basis for a finding of deceptive intent. *See Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1288–89 (Fed.Cir.2002). It is not enough to argue that, because "[p]atentees must err on the side of disclosure," a court should infer an intent to mislead such that a patent becomes unenforceable. (Sunbeam Reply at 18.) Therefore, the Court declines find that the Bankruptcy Court erred in failing to determine whether the Patent is unenforceable due to inequitable conduct.

## VI. Notice of Infringement

The Court now turns to the issues in Wing Shing's appeal, first addressing the Bankruptcy Court's conclusion that, "[h]aving failed to provide constructive or actual notice to Sunbeam prior to the commencement of the District Court Action, Wing Shing is precluded from the recovery of pre-suit claims." (Op. at 603–04.) Wing Shing argues that the Bankruptcy Court erred in holding that Wing Shing "forfeited" its right to prove actual notice rather than evaluating evidence of actual notice. (*See* WS Br. at 29–30.) Wing Shing also argues that, "[e]ven if this Court reads the [Bankruptcy Court's decision] to find as a matter of fact that Sham did not provide" actual notice to Sunbeam, that finding is clearly erroneous given the weight of the evidence against the finding. (*See id.* at 30–32.)

 The Court disagrees. The amount of damages a patentee may recover in an infringement action is statutorily limited to those acts of infringement that occurred after the alleged infringer had "notice of infringement." *See* 35 U.S.C. § 287(a) (1994). The statute permits either constructive notice, which may be accomplished by marking the article with the patent number, or actual notice. *See Gart v. Logitech, Inc.*, 254 F.3d 1334, 1345 (Fed. Cir.2001). The purpose of the notice requirement is to assure that the accused infringer knew of the adverse patent and the alleged infringement during the period in which liability for infringement accrues. *See id.*

 "[M]ere notice of the patent's existence or ownership is not notice of the infringement, and as such would be insufficient to comply with section 287(a)." *Id.* (quotations omitted). Rather, "affirmative communication to the alleged infringer of a specific charge of infringement by a specific accused product or device is required". *Id.* (quotations omitted). This does not mean that an unqualified charge of infringement and a threat of suit are needed. *See id.* at 1345–46. It is enough for a patentee to provide the alleged infringer with the identity of the patent, the activity believed to be infringing, and a proposal to somehow abate the alleged infringement. *See id.*

 The patentee has the burden of proving compliance with notice requirements. *See Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed.Cir.1996). Whether a patentee has provided adequate notice of infringement is a question of fact. *See Gart*, 254 F.3d at 1339 ("compliance with the marking statute, 35 U.S.C. § 287(a), is a question of fact"). The focus of the inquiry is on the actions of the patentee; the knowledge or understanding of the alleged infringer is irrelevant. *See id.* at 1346.

 This Court does not read the Bankruptcy Court's decision as failing to accept or reject evidence of actual notice.

Wing Shing contends that adequate notice of infringement was provided in a January 1996 conversation between Sham and Kubis at the Chicago housewares show. (*See* WS Br. at 29.) However, other than Sham's own testimony, there is no evidence that the conversation ever took place, much less that Sham provided Kubis the information necessary to satisfy notice during the alleged conversation. The Bankruptcy Court decided that it was "unwilling to accept an uncorroborated, self-serving conversation as the only evidence of actual notice of infringement." (Op. at 603.) The Court reads that as outright rejection of the evidence. The fact that "the Bankruptcy Court could have more precisely, and concisely, used the phrase 'does not accept'," Wing Shing Reply Br. at 2, does not detract from the Bankruptcy Court's finding. Though not to Wing Shing's liking, the Bankruptcy Court's "forfeiture" language simply expresses that the uncorroborated statement does not meet the required burden of proof.

This Court declines to disturb the Bankruptcy Court's finding. Focusing on the actions of Wing Shing, the Bankruptcy Court reasoned that Wing Shing's "sole source of actual notice"—the uncorroborated conversation—did not sustain a finding of actual notice. (*See* Op. at 603–04.) This is an issue of fact. The Bankruptcy Court was in the best position to judge the credibility of witnesses and determine whether testimony was credible. The Bankruptcy Court did not commit clear error in determining that Wing Shing failed to provide constructive or actual notice to Sunbeam and, therefore, is precluded from the recovery of pre-suit claims.[18]

18. Because this Court affirms the Bankruptcy Court's conclusion on the issue of notice, this Court does not address Wing Shing's argument regarding the doctrine of laches, *see* WS

## VII. Calculation of Profit

Finally, the Court addresses Wing Shing's appeal regarding the Bankruptcy Court's decision to exclude certain items from its calculation of Sunbeam's profit. Pursuant to 35 U.S.C. § 289, the Bankruptcy Court calculated Sunbeam's total profit resulting from the infringement. (*See* Op. at 618.) In calculating the total profit, the Bankruptcy Court determined that portions of certain categories of fixed expenses were deductible. (*See id.* at 619.) After declining to deduct seven categories of expenses, the Bankruptcy Court held that "the remainder of the line items are directly related to the AD Coffeemakers, and that the AD Coffeemakers could not have been brought to market without them." (*Id.*)

Wing Shing first takes issue with the 11 categories that comprise "the remainder of the line items." (WS Br. at 42–25.) Specifically, Wing Shing argues that the Bankruptcy Court erred as a matter of law in deducting portions of these categories because Sunbeam presented insufficient evidence of "what these categories included" and their connection to the AD coffeemakers. (WS Br. at 44.) Secondly, Wing Shing argues that "the Bankruptcy Court erred as a matter of law in allowing Sunbeam to allocate to the infringing AD Series coffeemakers costs that Sunbeam incurred as a result of its sales of Wing Shing coffeemakers." (WS Br. at 44.) By this argument, Wing Shing seeks to exclude fixed costs incurred by Sunbeam. "For example, if Sunbeam sold AD Series coffeemakers from Wing Shing, Sunbeam's marketing expenses would have been the same regardless of whether Sunbeam sold

Br. at 32–41, which is an alternate theory that prevents Wing Shing from recovering pre-suit claims. (*See* Op. at 603.)

AD Series coffeemakers from Simatelex." (*Id.*)

■■■ As a preliminary matter, this Court notes that questions as to the sufficiency of evidence are issues of fact and are reviewed under the "clearly erroneous" standard. "The infringer has the burden of 'offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue.'" *Hamil Am., Inc. v. GFI, Inc.*, 193 F.3d 92, 105 (2d Cir.1999) (citing 4 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 14.03[B], at 14–39 (1996)). "The reasonableness of the proffered overhead allocation formula is a question of fact in all cases." *Id.*

■■■ The Court finds that there is sufficient evidence on the record for the Bankruptcy Court to make reasonable determinations as to what categories and portions of items should be included and' what costs should be deducted in calculating Sunbeam's profit. (*See* D66; D67; D82 at 162:2–163:14, 163:24–164:19, 165:5–165:22, 179:17–181:10, 181:23–182:25.) Absolute certainty is not required of damages calculations. *See Hamil,* 193 F.3d at 105 ("In adopting this pragmatic approach, the court implicitly rejected the need for a detailed analysis of an infringer's ledgers."). The goal "is to arrive at a fair, accurate, and practical method of allocating the implicated overhead to the infringement." *Id.* The Court finds that the Bankruptcy Court accomplished this goal and declines to disturb the Bankruptcy Court decision, finding no clear error in the damages calculations as to the 11 categories of line items.

■■■ Wing Shing's second argument fares no better. What Wing Shing is really arguing here is that Sunbeam should not be allowed to deduct any portion of a fixed cost since, by definition, the fixed cost would have been incurred regardless of the infringement. Yet, profit from the infringing product is dependant to some extent on such fixed costs. To take Wing Shing's marketing example, had there been no marketing expenditures, sales of the infringing product would have slumped, driving down profit. "[T]he fixed expenses are as necessary to the infringing production as are the variable expenses, and should be similarly treated." *Schnadig Corp. v. Gaines Mfg. Co.*, 620 F.2d 1166, 1172 (6th Cir.1980). "The basic truth [is] that no article of manufacture can be profitable in a real sense if it cannot bear its proportionate share of the fixed costs." *Id.* Indeed, the dubiousness of Wing Shing's argument is best illustrated by the converse argument—that an infringer should be able to deduct the whole of the fixed costs from the sale of the infringing product because, without those costs, the infringer could never have sold the product. As the Bankruptcy Court correctly decided, portions of fixed costs are deductible in calculating profit to the extent those portions can be attributed to the infringing product. (*See* Op. at 619.) The Court finds no error in the Bankruptcy Court's damages calculations.

## CONCLUSION

For the reasons set forth above, the Bankruptcy Court's memorandum decision is affirmed in part and reversed in part. [03cv7190, 1–1, 6–1; 03cv7921, 1–1; 04cv3347, 2–1, 3–1]

SO ORDERED.